Christopher W. Keegan (SBN 232045)
chris.keegan@kirkland.com
KIRKLAND & ELLIS LLP
555 California St., Suite 2900
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

*Counsel for Defendants and Third-Party
Plaintiffs Amplify Energy Corp., Beta
Operating Company, LLC, and San
Pedro Bay Pipeline Company*

[*Additional Counsel on Signature Page*]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| PETER MOSES GUTIERREZ, Jr.; CHANDRALEKHA WICKRAMASEKARAN and RAJASEKARAN WICKRAMASEKARAN, as Trustees of THE WICKRAMASEKARAN FAMILY TRUST established March 12, 1993; *et al.* individually and on behalf of all others similarly situated, | Case No. 8:21-cv-01628-DOC-JDE Judge: Hon. David O. Carter |
| Plaintiffs, | **DEFENDANTS/THIRD-PARTY PLAINTIFFS AMPLIFY ENERGY CORP., BETA OPERATING COMPANY, LLC, AND SAN PEDRO BAY PIPELINE COMPANY'S THIRD-PARTY VERIFIED COMPLAINT** |
| v. | |
| AMPLIFY ENERGY CORP.; BETA OPERATING COMPANY, LLC; and SAN PEDRO BAY PIPELINE COMPANY, | 1. CONTRIBUTION UNDER 33 U.S.C. § 2709 (OIL POLLUTION ACT) 2. NEGLIGENCE PER SE (IN ADMIRALTY) 3. NEGLIGENCE (IN ADMIRALTY) 4. TRESPASS (IN ADMIRALTY) |
| Defendants/Third-Party Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| MEDITERRANEAN SHIPPING COMPANY, S.A.; DORDELLAS FINANCE CORPORATION; MSC | |

1
2
3
4
5
6

DANIT; ROES 1-100; COSTAMARE SHIPPING CO., S.A.; CAPETANISSA MARITIME CORPORATION; V.SHIPS GREECE LTD.; COSCO BEIJING; ROES 101-200; and MARINE EXCHANGE OF LOS ANGELES-LONG BEACH HARBOR d/b/a MARINE EXCHANGE OF SOUTHERN CALIFORNIA,

7
8

                    Defendants/Third-Party
                    Defendants.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD-PARTY VERIFIED COMPLAINT

1   Defendants/Third-Party Plaintiffs Amplify Energy Corp. ("Amplify Energy"),
2   Beta Operating Company, LLC d/b/a Beta Offshore ("Beta"), and San Pedro Bay
3   Pipeline Company  (collectively, "Amplify") bring this complaint against:  Defendants
4   Mediterranean Shipping Company, S.A. ("MSC") and Dordellas Finance Corporation,
5   as well as Third-Party Defendants the MSC *Danit* (proceeding *in rem*) and the MSC
6   *Danit*'s captain and crew, the identities of which are currently unknown to Amplify
7   (collectively, "MSC Defendants"); Defendants Costamare Shipping Co. ("Costamare")
8   and Capetanissa Maritime Corporation, as well as Third-Party Defendants V.Ships
9   Greece Ltd., the COSCO *Beijing* (proceeding *in rem*), and the COSCO *Beijing*'s captain
10  and other crew, the identities of which are currently unknown to Amplify (collectively,
11  "Beijing Defendants," and, together with MSC Defendants, "Shipping Defendants");
12  and Third-Party Defendant Marine Exchange of Los Angeles-Long Beach Harbor d/b/a
13  Marine Exchange of Southern California ("Marine Exchange").  Amplify alleges the
14  following based on personal knowledge, information, and belief.  Amplify requests a
15  jury trial for all eligible claims.

16  **INTRODUCTION**

17  This is a complaint for damages and injunctive relief against two massive
18  containerships, the MSC *Danit* and the COSCO *Beijing*, their owners, operators, and
19  crews, ***and*** Marine Exchange, the entity charged with monitoring and directing vessel
20  traffic in San Pedro Bay.  These parties' actions and inactions, as described below,
21  caused and continue to cause Amplify significant and substantial harm.  And—if they
22  had not been negligent—the October 2021 oil discharge off the coast of Southern
23  California never would have happened.

24  Longer than the Wilshire Grand is tall, the COSCO *Beijing* measures over 1,100
25  feet from end to end and has a deadweight of over 107,000 tons.  The MSC *Danit* is
26  even larger, stretching nearly 1,200 feet from front to back and with a deadweight of
27  over 165,000 tons.

28

On January 25, 2021, both containerships sat anchored in the San Pedro Bay while waiting to unload their goods at one of the nearby ports.  Early that morning, broadcasts warned of an approaching storm, and authorities instituted "heavy weather protocols."  Many other ships in the area left their anchorages and took refuge in deeper waters.  The MSC *Danit* and COSCO *Beijing* did not.

Instead, the MSC *Danit* and COSCO *Beijing* remained anchored about 4.8 miles off the California coast, next to the undersea San Pedro Bay Pipeline (Pipeline P00547), which has been in place since 1980.  The San Pedro Bay Pipeline transports oil from offshore production and processing platforms to Long Beach, California.  In accordance with National Oceanic and Atmospheric Administration ("NOAA") guidance, Amplify reported the location of the Pipeline.  Nautical maps of the area thus specify the Pipeline's location, such that all Defendants knew or should have known precisely where the Pipeline was.  Federal law forbids ships from using their anchors too close to this very Pipeline.

The warned-of winter storm then entered the San Pedro Bay, bringing with it winds of up to 63 miles-per-hour and waves of up to 17 feet.  Driven by winds and waves, both the MSC *Danit* and COSCO *Beijing* dragged their anchors across the seafloor and into areas where federal law prohibits anchoring.  As the MSC *Danit* and COSCO *Beijing* dragged their anchors, both anchors hooked onto the concrete-encased Pipeline and dragged a 4,000-foot section of the Pipeline across the seafloor.  The anchor-dragging bent and bowed the Pipeline, displacing some parts of the Pipeline by more than 100 feet and breaking off the concrete casing around the Pipeline.

Yet despite dragging anchor while repeatedly crossing over the well-charted location of the Pipeline, the MSC Defendants and Beijing Defendants failed to alert Amplify of the incidents.  Nor did Marine Exchange—which monitors such movements in real-time and knew or should have known that the ships had crossed over the Pipeline multiple times while broadcasting that they were "at anchor"—inform Amplify of the ships' movements.

Months later, the damaged and displaced Pipeline leaked oil into the San Pedro Bay. Within days, the Coast Guard's ensuing investigation into the discharge quickly revealed the Shipping Defendants' roles in the oil discharge. The Coast Guard determined that the MSC *Danit* had dragged its anchor near the Pipeline on January 25, 2021. Following the discovery of the MSC Defendants' anchor-dragging, the Coast Guard's lead investigator Capt. Jason Neubauer said at a press conference, "I'm highly confident—I'm convinced—that this was the initial event that deflected the pipeline" from its position on the seafloor.[1] Not long thereafter, the Coast Guard determined that the COSCO *Beijing* had also dragged its anchor near the Pipeline. Then, after one of the COSCO *Beijing*'s crew members allegedly attempted to flee the country, the MSC *Danit*'s owner asked this Court for emergency relief to secure his deposition. The Coast Guard's investigation into the anchor-dragging incidents remains ongoing.

The Shipping Defendants' and Marine Exchange's actions and inactions led directly to the October 2021 oil discharge. The Shipping Defendants were grossly negligent and reckless in anchoring their ships close to an undersea pipeline during a severe weather event, failing to properly anchor the vessels to avoid dragging anchor, and failing to report the incident to authorities and Amplify. Amplify seeks damages for harm to its business and reputation including—but not limited to—the costs of repairing and replacing the Pipeline and the material reduction in revenue and profits Amplify has suffered while Amplify's operations off the coast of Southern California have been suspended. Amplify also seeks contribution from the Shipping Defendants for the damages and costs Amplify must pay on account of the discharge.

Marine Exchange was also grossly negligent and reckless in allowing the vessels to remain anchored near the Pipeline when heavy weather was imminent and failing to notify Amplify of the ships' anchor-dragging. To prevent future incidents of this kind,

---

[1] *MSC Boxship May Have Dragged Anchor Over San Pedro Pipeline*, Maritime Executive, (Oct. 17, 2021, 4:12 PM), https://www.maritime-executive.com/article/uscg-msc-boxship-may-have-dragged-anchor-over-san-pedro-pipeline.

THIRD-PARTY VERIFIED COMPLAINT

Amplify seeks injunctive relief against Marine Exchange requiring it to (1) warn owners of undersea property of anchor-dragging incidents near their property within 24 hours of any such incident and (2) prevent vessels from anchoring near the Pipeline when heavy weather is likely.

## PARTIES

1.     Defendant and Third-Party Plaintiff Amplify Energy Corp. is organized under the laws of Delaware and headquartered in Houston, Texas.  It is an oil and natural gas company engaged in the acquisition, development, and production of oil and natural gas properties.

2.     Defendant and Third-Party Plaintiff Beta Operating Company, LLC d/b/a Beta Offshore is an indirect, wholly owned subsidiary of Amplify Energy organized under the laws of Delaware and headquartered in Houston, Texas.  Beta owns and operates two production and one processing platform servicing oil and natural gas wells located in federal waters off the coast of southern California, all of which rely on the San Pedro Bay Pipeline to transport product to onshore facilities.

3.     Defendant and Third-Party Plaintiff San Pedro Bay Pipeline Company is a wholly owned subsidiary of Amplify Energy organized under the laws of California and headquartered in Long Beach, California.  San Pedro Bay Pipeline Company owns the San Pedro Bay Pipeline, which connects Beta's offshore oil platforms to onshore terminals for further shipment to third-party processing facilities.

4.     Defendant Mediterranean Shipping Company, S.A. is incorporated under the laws of Switzerland and headquartered in Geneva, Switzerland.  MSC operates the MSC *Danit*, and is the majority owner of Dordellas Finance Corporation, which owns the MSC *Danit*.  MSC is one of the world's largest shipping companies, with over 600 vessels in its fleet and more than 100,000 employees.  MSC has an employee on the Board of Directors of Third-Party Defendant Marine Exchange.

5.     Defendant Dordellas Finance Corporation is a Panamanian corporation. Dordellas Finance Corporation owns the MSC *Danit*.

6.      Third-Party Defendant MSC *Danit* is a Panama-flagged vessel being sued *in rem*.  The MSC *Danit* is owned by Dordellas Finance Corporation and operated by MSC.  The MSC *Danit* is a "New-Panamax"-sized containership, measuring nearly 1,200 feet (366 meters) long and almost 170 feet (52 meters) wide with a deadweight of over 165,000 tons and a carrying capacity of about 14,000 shipping containers.  When built in 2009, the MSC *Danit* was among the largest ships in the world.  The MSC *Danit*'s International Maritime Organization ("IMO") number is 9404649.

7.      Amplify also brings claims against the currently unknown captain and crewmembers of the MSC *Danit* at the time of the alleged conduct, Roes 1-100.

8.      Defendant Capetanissa Maritime Corporation is a Liberian corporation and a subsidiary of Costamare, Inc., one of the world's leading containership companies.  Defendant Capetanissa Maritime Corporation owns the COSCO *Beijing*.

9.      Defendant Costamare Shipping Co., S.A., is headquartered in Greece and incorporated under the laws of Panama.  Defendant Costamare is the shipping manager for Costamare, Inc., and it operates the COSCO *Beijing*.

10.     Third-Party Defendant V.Ships Greece Ltd. is headquartered in Greece and incorporated under the laws of Bermuda.  V.Ships Greece Ltd. also operates the COSCO *Beijing*.

11.     Third-Party Defendant COSCO *Beijing* is a Malta-flagged vessel being sued *in rem*.  The COSCO *Beijing* is owned by Capetanissa Maritime Corporation and operated by V.Ships Greece Ltd. and Costamare.  The COSCO *Beijing* measures about 1,150 feet (350 meters) long and about 140 feet (42.8 meters) wide with a deadweight of over 107,000 tons and a carrying capacity of over 9,000 shipping containers.  The COSCO *Beijing*'s IMO is 9308508.

12.     Amplify also brings claims against the currently unknown captain and crewmembers of the COSCO *Beijing* at the time of the alleged conduct, Roes 101-200.

13.     Third-Party Defendant Marine Exchange is a 501(c)(6) organization organized under the laws of California and located in San Pedro, California.  Marine

THIRD-PARTY VERIFIED COMPLAINT

Exchange monitors and directs vessel traffic in and around the Ports of Los Angeles and Long Beach.

14.    As investigations remain ongoing, Amplify anticipates adding additional defendants as the investigations progress and discovery ensues.

## JURISDICTION AND VENUE

15.    Amplify sues under the Oil Pollution Act of 1990 ("OPA") and federal maritime law.

16.    The Court has subject matter jurisdiction under 33 U.S.C. § 2717(b), which grants district courts "exclusive original jurisdiction over all controversies arising under" the OPA.

17.    The Court has subject matter jurisdiction over claims sounding in admiralty under 28 U.S.C. § 1333(1); *see also* 46 U.S.C. § 30101(a) ("The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.").

18.    Defendants' tortious acts took effect on the navigable waters of the United States when the ships dragged their anchors across the Pipeline, and again when the damaged and displaced Pipeline discharged oil into San Pedro Bay.

19.    Defendants' tortious acts disrupted maritime commerce by causing the Pipeline's failure and have a substantial relationship to a traditional maritime activity because they are related to shipping and navigation.

20.    The Court has personal jurisdiction over the MSC Defendants.

21.    MSC is one of the world's largest shipping companies and routinely operates vessels coming in and out of California's ports, including one or more ports in this district.

22.    Upon information and belief, the MSC *Danit* regularly sails in and out of California's ports, having made calls at the Port of Los Angeles or Port of Long Beach at least six times in 2021 alone.

23.     MSC has, at all relevant times, operated the MSC *Danit*.  MSC also owns a majority share of the MSC *Danit*'s owner, Dordellas Finance Corporation.

24.     MSC and Dordellas Finance Corporation knew or should have known that the MSC *Danit* regularly entered one or more ports within this district.

25.     Defendant Dordellas Finance Corporation has also asked this Court for affirmative relief in a related matter, petitioning this Court for an order to allow it to secure a deposition from a member of the COSCO *Beijing*'s crew who allegedly attempted to flee the country.  The same filing specifically requested that the "Court retain jurisdiction of this matter to enforce its order" and grant Dordellas Finance Corporation "all other relief to which it may show itself to be entitled."  *See In re Application of Dordellas Finance Corp.*, No. 2:21-mc-01106-UA-PLA (C.D. Cal. Nov. 27, 2021), ECF No. 1, at 12.

26.     The MSC employees aboard the MSC *Danit* at the time of the anchor-dragging incident, including, but not limited to the captain and crewmembers, are also properly subject to this Court's personal jurisdiction.

27.     MSC employees aboard the MSC *Danit* caused an anchor-dragging incident that displaced and damaged Amplify's Pipeline.

28.     MSC employees therefore have significant contacts with California and the United States through their regular presence in California's ports and the navigable waters of the United States, and their role in the anchor-dragging incident.  The exercise of personal jurisdiction over such defendants is proper because this litigation arises out of their contacts with California and the United States.

29.     In consideration for Amplify Energy and its affiliates refraining from arresting, seizing or otherwise detaining, and agreeing not to seize, arrest, re-arrest, attach or otherwise detain the MSC *Danit*, United Kingdom Mutual Steam Ship Assurance Association Limited, acting on behalf of the vessel and its owner, has provided a Letter of Undertaking with security in the amount of $97.5 million.  Letter from John A. Walsh II, Collier Walsh Nakazawa LLP to Amplify Energy Corp. (Nov.

19, 2021) (on file with author) (the "MSC *Danit* LOU").  The Court has jurisdiction over Amplify's *in rem* claim against the MSC *Danit* on account of this security.

30.     The Letter of Undertaking also states as follows: "It is the intent of this Letter of Undertaking that the rights of the parties shall be precisely the same as they would have been had the Vessel been arrested under process issued out of the United States District Court for the Central District of California, then taken into custody by the United States Marshal under said *in rem* process, and had been released upon the filing of a release bond in the foregoing amount and a Verified Statement of Right or Interest."  MSC *Danit* LOU, at 2.

31.     The Court also has personal jurisdiction over the Beijing Defendants.

32.     Upon information and belief, the COSCO *Beijing* regularly sails in and out of California's ports, having made calls at the Port of Los Angeles or Port of Long Beach at least twice in 2021.

33.     Capetanissa Maritime Corporation knew or should have known that the COSCO *Beijing* regularly entered one or more ports within this district.

34.     Costamare and V.Ships Greece Ltd. are global shipping companies which have, at all relevant times, operated the COSCO *Beijing*.  They knew or should have known that the COSCO *Beijing* regularly entered one or more ports within this district.

35.     The Costamare and/or V.Ships Group Ltd. employees, including, but not limited to the captain and crewmembers, are also properly subject to this Court's personal jurisdiction due to their extensive and regular contacts with California and the United States.

36.     The Costamare and/or V.Ships Group Ltd. employees caused an anchor-dragging incident in close proximity to Amplify's Pipeline that displaced and damaged Amplify's Pipeline.

37.     Costamare and/or V.Ships Greece Ltd. employees therefore have significant contacts with California and the United States through their regular presence in California's ports and the navigable waters of the United States, as well as their role

in the anchor-dragging incident. The exercise of personal jurisdiction over such defendants is proper because this litigation arises out of their contacts with California and the United States.

38.     In consideration for Amplify Energy and its affiliates refraining from arresting, seizing or otherwise detaining, and agreeing not to seize, arrest, re-arrest, attach or otherwise detain the COSCO *Beijing*, The Swedish Club, acting on behalf of the vessel and its owners and managers, has provided a Letter of Undertaking with security for the agreed-upon value of the vessel. Letter from Albert E. Peacock III, Peacock Piper Tong + Voss LLP to Amplify Energy Corp. (Jan. 18, 2022) (on file with author) (the "COSCO *Beijing* LOU"). The Court has jurisdiction over Amplify's *in rem* claims against the COSCO *Beijing* on account of this security.

39.     The Letter of Undertaking also states as follows: "It is the intent of this Letter of Undertaking that the rights of the parties shall be precisely the same as they would have been had the Vessel been arrested under process issued out of the United States District Court for the Central District of California, then taken into custody by the United States Marshal under said *in rem* process and had been released upon the filing of appropriate security in the foregoing amount." COSCO *Beijing* LOU, at 2.

40.     A maritime lien exists for Amplify's claims against the MSC *Danit* and COSCO *Beijing*.

41.     By virtue of those liens, Amplify is entitled to the enforcement of a maritime lien *in rem* against the MSC *Danit* and COSCO *Beijing*.

42.     This litigation arises out of or is related to all Shipping Defendants' contacts with California and the United States because the anchor-dragging incidents happened as a result of Shipping Defendants' contacts with California and the United States, particularly Shipping Defendants' use of California ports and the navigable waters of the United States.

43.     Marine Exchange is incorporated and headquartered in California, so it is subject to general jurisdiction in California's federal courts.

44.     Venue is proper under the OPA because Plaintiffs' alleged damages occurred within this district.  33 U.S.C. § 2717(b).

45.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events related to the action took place within this district or in federal waters located adjacent to this district.

46.     Venue is proper under admiralty law because the Court has jurisdiction over the Defendants.  *See KKMI Sausalito, LLC v. Vessel "Self Inflicted"*, 428 F. Supp. 3d 200, 204 (N.D. Cal. 2019).

**FACTS**

**The San Pedro Bay Pipeline**

47.     Third-Party Plaintiff San Pedro Bay Pipeline Company owns and operates the San Pedro Bay Pipeline (Pipeline P00547) that connects  two production and one processing platform (named Ellen, Eureka, and Elly, respectively) located in federal waters off the coast of Huntington Beach, California to onshore facilities.  Third-Party Plaintiff Beta owns and operates those oil platforms.  The Pipeline transports minimally processed oil from the processing platform, Elly, to onshore facilities.

48.     The Pipeline became operational in 1980.  In accordance with NOAA guidance, Amplify reported the location of the Pipeline, and the Pipeline is well-marked on nautical maps of the San Pedro Bay.  All Defendants and the Coast Guard knew, or should have known, the location of the Pipeline.

49.     For instance, in this portion of a publicly available map from the NOAA below,[2] the yellow highlighted line represents the Pipeline:



50.     The section of that chart discussing submarine pipelines and cables also instructs that "[m]ariners should use extreme caution . . . when anchoring, dragging, or trawling."

**The Marine Exchange of Southern California Vessel Traffic Service**

51.     Defendant Marine Exchange is responsible for the safe passage of all vessels within a 25-mile radius from Point Fermin in the San Pedro Bay area.

---

[2] National Oceanic and Atmospheric Administration, https://www.charts.noaa.gov/PDFs/18746.pdf (cropped and highlighted for ease of reading).

THIRD-PARTY VERIFIED COMPLAINT

52.     The Ports and Waterways Safety Act ("PWSA") authorizes the U.S. Coast Guard to establish vessel traffic service ("VTS") schemes for waters subject to congested vessel traffic.

53.     Marine Exchange operates the VTS for Southern California in conjunction with the Coast Guard and with the assistance of the California Office of Spill Prevention and Response and the Ports of Los Angeles and Long Beach.  Marine Exchange monitors and directs vessel traffic and assigns vessels anchorages.

54.     VTS serves to ensure "safe, secure, efficient, reliable, and environmentally sound maritime transportation through the prevention of collisions between vessels, allisions (ship striking a fixed object such as a bridge), and grounding" in order to protect the environment and the public from damage.[3]

55.     VTS operators monitor vessel movements in real time through an Automatic Identification System ("AIS").

56.     Each vessel, through its AIS transponder, automatically and continuously transmits and receives critical data about the vessel, including its name, call sign, position, course, and speed, to other nearby vessels and shore-based users via radio transmissions.

57.     The VTS also has a network of land-based AIS receivers along the shore that allows VTS operators to monitor and track vessels along the coastline and 100 miles out to sea.

58.     AIS thus enables VTS operators to view "very detailed displays of vessels as they move in the tight confines of the harbors . . . in all weather, day and night."[4]

---

[3]  *A History of the Marine Exchange*, Marine Exchange of Southern California, https://mxsocal.org/history/.

[4]  *Id.*

THIRD-PARTY VERIFIED COMPLAINT

59.     AIS also can advise of a potential collision, determine whether a ship's anchor may be dragging,[5] or, according to Marine Exchange's executive director, Captain Kip Louttit, "tell if a ship crosses over a pipeline."[6]

60.     Using the AIS, Marine Exchange's VTS operators identify vessels that cause incidents, including communications problems, erratic maneuvers, mechanical failures, and improper navigation, and refer them to the Coast Guard.[7]

61.     Marine Exchange's VTS operators also maintain an incident report database, which the Coast Guard uses to analyze trends and occurrences and share them with vessel operators.[8]

62.     Marine Exchange also uses a Physical Oceanographic Real Time System ("PORTS") to monitor and transmit information on tides, visibility, winds, currents, and sea swell to maritime users.  The PORTS is a system of environmental sensors and supporting telemetry equipment that gathers and disseminates this information in real time.[9]

63.     The VTS operates under "heightened awareness and vigilance" during inclement weather, such as sustained winds over 21 knots and wave heights exceeding 10 feet.[10]

---

[5]  Dr. James A. Fawcett, *Coordinating Vessels in the Ports of San Pedro Bay: The Marine Exchange of Southern California*, USCDornslife (Apr. 30, 2021), https://dornsife.usc.edu/uscseagrant/12-the-marine-exchange-of-southern-california/.

[6]  Mike Soraghan, *Pipeline owner kept 'in the dark' on possible anchor strike*, Energywire (Dec. 17, 2021, 7:24 AM), https://www.eenews.net/articles/pipeline-owner-kept-in-the-dark-on-possible-anchor-strike/.

[7]  Los Angeles/Long Beach Harbor Safety Committee, *Harbor Safety Plan for the Ports of Los Angeles and Long Beach*, at XI-2 (June 30, 2017), https://mxsocal.org/assets/pdf/hsp/lalb-hsp-combined-210706.pdf.

[8]  *Id.* at XI-2.

[9]  *Id.* at II-2.

[10]  *Id.* at XVII-6.

64.     Specifically, under the Harbor Safety Plan for the Ports of Los Angeles and Long Beach—which was created to "reduce the chance of accidents that can result in spills or other environmental damage"[11]—"[w]hen winds exceed 40 knots, the VTS will maintain a heightened awareness for dragging anchors in the federal anchorages."[12]

**The MSC *Danit* and COSCO *Beijing* Drag Anchor**

65.     On the morning of January 25, 2021, the MSC *Danit* was anchored near the Pipeline in the San Pedro Bay a few miles off the coast of Huntington Beach, California.  The ship was waiting to dock and unload its cargo.

66.     The COSCO *Beijing* was also anchored near the Pipeline and awaiting a berth at one of the nearby ports.

67.     The MSC *Danit* had been anchored in that location since January 18, 2021.  Other large containerships were anchored in the area, as historic backlogs in the nearby ports led to over-crowding in the waters surrounding the ports and the placement of ships further from shore.

68.     As Marine Exchange's Captain Kip Louttit has since observed, it is "unacceptable to have this many vessels this close together through the winter."[13]

69.     To remain stable, large ships like the MSC *Danit* and the COSCO *Beijing* use anchors that can weigh 10 tons or more and hundreds of feet of thick chains to tie those anchors to their vessels.  Many vessels feature anchors of 30 tons or more, and those anchors can settle 10 feet deep in offshore sediment.

70.     Ships usually release a length of chain five to seven times the depth of the water in which they are anchored.  The length of chain resting on the seafloor creates friction that helps stabilize the vessel.

---

[11] *Id.* at XV-1.

[12] *Id.* at XVII-6.

[13] Paul Berger, *Southern California's Container-Ship Backlog Moves Farther Out to Sea*, Wall Street Journal (Dec. 10, 2021, 5:33 AM), https://on.wsj.com/3q4XWJ5.

71.    If winds and waves create forces stronger than the friction between the seabed and the ship's anchor and chain, then the wind and waves will push the ship and the ship may drag its anchor across the seafloor.

72.    Containerships are especially vulnerable to dragging anchor because their height gives them what sailors call a large "sail area."  A containership's height—particularly when thousands of shipping containers are stacked on it—"presents what amounts to a flat 'sail' to the wind."[14]  When high enough winds hit that "sail," containerships move and drag their anchors and carry anything caught by those anchors with them.

73.    During the winter, high winds often blow through the San Pedro Bay. Those winds present a danger of anchor-dragging that was known or should have been known to the captains and crews of the MSC *Danit* and COSCO *Beijing*.  During one recent high-wind event in the area, "winds of 40 to 50 knots caused eight ships to drag their anchors along the seabed."[15]

74.    In January 2021, the danger posed by inclement weather was particularly high given the backlog of containerships awaiting berth in the ports of Long Beach and Los Angeles.

75.    Before the anchor-dragging incidents, broadcasts warned of a winter storm that would be a "high wind event."[16]

76.    In anticipation of the storm, heavy weather protocols were put in place at 2:00 a.m. on January 25, 2021.  More than 20 vessels left their anchorages outside the ports of Long Beach and Los Angeles—near where the MSC *Danit* and COSCO *Beijing* were anchored—to ride out the storm in deeper waters.

---

[14] Dr. James A. Fawcett, *Vessel Anchoring*, University of Southern California (Oct. 28, 2021), https://dornsife.usc.edu/uscseagrant/16-vessel-anchoring/.

[15] Berger, *supra*.

[16] Soraghan, *supra*.

THIRD-PARTY VERIFIED COMPLAINT

77.     Neither the MSC *Danit* nor the COSCO *Beijing* rode out to deeper waters in advance of the storm.  Instead, both ships remained in the waters near the Pipeline while the storm descended on the San Pedro Bay, bringing with it high winds and waves.[17]

78.     Federal law requires ships to anchor within certain permissible anchorage grounds.  *See* 33 C.F.R. § 110.214(a)(4) ("Within Los Angeles Harbor, Long Beach Harbor, and the Los Angeles-Long Beach Precautionary Area, except for emergency reasons, or with the prior approval of the Captain of the Port, vessels are prohibited from anchoring outside of designated anchorage areas.").

79.     The anchoring regulations are intended to ensure the safe passage of ships into and out of the Ports of Long Beach and Los Angeles and to prevent vessels from damaging other vessels and surrounding facilities.  *See* 33 C.F.R. § 109.05.

80.     The San Pedro Bay Pipeline sits outside the designated anchorage areas.

81.     In the early morning hours of January 25, 2021, the MSC *Danit* exited the permissible anchorage zone and moved directly over the San Pedro Bay Pipeline.  As it moved outside its permitted anchorage, the MSC *Danit* dragged its anchor along the seabed near the Pipeline.

82.     That same morning, the COSCO *Beijing* also exited the permissible anchorage zone where it had been and crossed over the San Pedro Bay Pipeline.  Like the MSC *Danit*, the COSCO *Beijing* dragged its anchor along the seabed near the Pipeline.

83.     According to filings from Dordellas Finance Corporation in an action before this Court, the MSC *Danit* was in the midst of raising its own anchor to sail to deeper waters when the COSCO *Beijing* came within about 560 feet of a collision with

---

[17] *See* Robert Tuttle, *Latest Threat in Supply Chain Nightmares Is Storm Season at Sea*, Bloomberg (Nov. 5, 2021, 3:00 AM PDT), https://www.bloomberg.com/news/articles/2021-11-05/latest-threat-in-supply-chain-nightmares-is-storm-season-at-sea (noting that "area's storm season that's already underway will bring high winds and choppy seas"); Berger, *supra* (noting that "winter weather sweeps in . . . strong winds and rough seas").

the MSC *Danit*. *In re Application of Dordellas Finance Corp.*, No. 2:21-mc-01106-UA-PLA (C.D. Cal. Nov. 27, 2021), ECF No. 1, at 5. The same filings allege that the MSC *Danit* ceased its anchor-raising operations and took action to avoid a collision with the COSCO *Beijing*. *Id.* Notably, the filings do not deny that the MSC *Danit* dragged anchor on the Pipeline.

84.    The MSC *Danit*'s AIS data shows that it began moving erratically while still broadcasting that it was at anchor early on the morning of January 25.

85.    At or around 5:47 a.m., while still broadcasting that it was "at anchor," the MSC *Danit* crossed over the Pipeline; it then crossed over the Pipeline several more times over the next three hours.

86.    In the following image, the red line shows the MSC *Danit*'s AIS signals as it crossed over the Pipeline, which is represented by the yellow line.



87.    Upon information and belief, as the MSC *Danit* zig-zagged over the Pipeline, its anchor caught the Pipeline and dragged a 4,000-foot section of it across the

---

[18] *See* Mike Schuler, *Investigators Say MSC Containership Dragged Anchor Near Broken San Pedro Bay Pipeline in January*, gCaptain (Oct. 17, 2021), https://gcaptain.com/investigators-identify-msc-danit-dragged-anchor/ (embedding image from @SkyTruth, Twitter (Oct. 17, 2021, 10:12 AM), https://twitter.com/SkyTruth/status/1449740116319260689)).

seabed, pulling it over 100 feet out of line and knocking off the concrete casing that protected the Pipeline and provided weight to keep the Pipeline in place on the seabed.

88.     As noted above, the MSC *Danit* was not alone in dragging anchor that morning.

89.     In the image below, the red line represents the MSC *Danit*'s movements, and the blue line represents the COSCO *Beijing*'s.[19]



90.     The AIS data shows that both the MSC *Danit* and the COSCO *Beijing* repeatedly crossed over the Pipeline while dragging anchor.

91.     In the following image,[20] the dotted lines represent seabed scarring near the Pipeline, the orange line represents the Pipeline's original route, and the purple line shows the Pipeline's post-drag location.   A 4,000-foot section of the Pipeline was displaced, with a maximum displacement of 105 feet.

[19] Maritime Executive, *Second Vessel Identified in Investigation of California Oil Spill*, (Nov. 19, 2021, 8:43 PM), https://www.maritime-executive.com/article/second-vessel-identified-in-investigation-of-california-oil-spill (embedding image from @SkyTruth, Twitter (Nov. 19, 2021, 3:52 PM), https://twitter.com/SkyTruth/status/1461844844800794625?ref_src=twsrc%5Etfw).

[20] Aqueos Corporation, Beta 16" Oil Pipeline Multibeam Survey (Nov. 7, 2021).

92.    According to Dordellas Finance Corporation's filings, the COSCO *Beijing* came within about 560 feet of the MSC *Danit*. *In re Application of Dordellas Finance Corp.*, No. 2:21-mc-01106-UA-PLA (C.D. Cal. Nov. 27, 2021), ECF No. 1, at 5. Given that proximity between the ships, the length of the chains typically used to anchor such vessels, and the COSCO *Beijing*'s own movements over the Pipeline while dragging anchor, Amplify alleges upon information and belief that the COSCO *Beijing* also dragged anchor on the Pipeline.

93.    After the MSC *Danit* dragged anchor for hours while crisscrossing around the Pipeline, the MSC Defendants eventually raised the ship's anchor and sailed away.

94.    The COSCO *Beijing* remained at anchor after the MSC *Danit* departed.

95.    Federal regulations impose a duty on ship owners and operators to report to the Coast Guard hazardous conditions and damages that their vessels cause.

96.    Upon information and belief, neither the MSC Defendants nor the Beijing Defendants reported their anchor-dragging incidents to authorities despite dragging anchor while crossing over the Pipeline repeatedly.

97.    The Shipping Defendants failed to inform Amplify that they had anchor-dragging incidents in close proximity to the Pipeline.

98.    Upon information and belief, Marine Exchange knew or should have known that the MSC *Danit* and COSCO *Beijing* dragged anchor over the Pipeline, but failed to inform Amplify.

**The San Pedro Bay Pipeline Leaks Oil**

99.    It is alleged that in early October 2021, the San Pedro Bay Pipeline leaked oil from a crack in the Pipeline located about 4.8 miles offshore.

100.   Upon information and belief, the crack in the Pipeline is located at a latitude of 33°38'58.1056" North, and a longitude of 118°06'38.7240" West.  At that location, the top of the Pipeline is at a depth of approximately 96 feet.

101.   The location of the crack corresponds to an area where the AIS data for both ships shows that they crossed over the Pipeline multiple times while dragging anchor on January 25.

102.   Because Amplify Energy owns the Pipeline, the Coast Guard designated Amplify Energy as the "responsible party" for the discharge for purposes of the OPA.

103.   On or about October 16, 2021, the Coast Guard announced that MSC and Dordellas Finance Corporation had been designated as "parties in interest" in its investigation into the early October oil discharge from the San Pedro Bay Pipeline.[21]

104.   On or about November 19, 2021, the Coast Guard announced that because of the COSCO *Beijing*'s anchor-dragging near the Pipeline, the owner and the operator of the COSCO *Beijing*—Capetanissa Maritime Corporation of Liberia and V.Ships Greece Ltd., respectively—had also been designated as parties in interest in its investigation.[22]

105.   The Coast Guard's investigation remains ongoing.

106.   According to a filing from Dordellas Finance Corporation, one of the COSCO *Beijing*'s crew members refused to answer any questions from investigators when they boarded the COSCO *Beijing* and interviewed him.  *See In re Application of Dordellas Finance Corp.*, No. 2:21-mc-01106-UA-PLA (C.D. Cal. Nov. 27, 2021), ECF No. 1, at 2-3.

---

[21] Caroline Linton, *Coast Guard names 'parties in interest' in anchor-dragging incident that damaged pipeline ahead of spill*, CBS News (Oct. 17, 2021, 5:02 PM), https://www.cbsnews.com/news/california-oil-spill-parties-in-interest-coast-guard.

[22] Coast Guard News, *Coast Guard issues 'party in interest' designation*, (Nov. 19, 2021), https://coastguardnews.com/coast-guard-issues-party-in-interest-designation/2021/11/19.

107.   Then, according to the filing, that crew member tried to flee the country. *See id.*, at 2.

108.   On account of the anchor strikes and subsequent release of oil, Amplify has suffered and will continue to suffer harm to its business and reputation.  Amplify has had to cease operations of its Southern California offshore facilities resulting in a material reduction in revenue.  Amplify must, at significant cost, repair and replace sections of the Pipeline and receive the necessary regulatory approvals before it can potentially restart operations.

109.   To date, Amplify Energy, Beta, and San Pedro Bay Pipeline Company have been sued in 15 separate actions stemming from the October oil discharge, all but one of which are putative class actions.  All of the putative class actions have been consolidated into this action, and other cases may be as well.  *See generally Peter Moses Gutierrez, Jr., et al. v. Amplify Energy Corp. et al.*, No. 8:21-cv-01628-DOC-JDE (C.D. Cal. Dec. 20, 2021), ECF No. 44, at 2 (consolidating pending class actions into 8:21-cv-01628-DOC-JDE).  The class-action plaintiffs seek damages from Amplify Energy, Beta, and San Pedro Bay Pipeline Company for various alleged injuries, including economic losses and property damage related to the discharge of oil from the Pipeline. *See* Consolidated Compl., *Gutierrez v. Amplify Energy Corp.*, 8:21 CV 01628 (C.D. Cal. Jan. 28, 2022), ECF No. 102.

## CAUSES OF ACTION

### Count 1: Contribution Under The Oil Pollution Act, 33 U.S.C. § 2709, Against All Defendants

110.   Amplify repeats and realleges its allegations in the preceding paragraphs, as if fully set forth herein.

111.   The United States Coast Guard designated Amplify Energy as the "responsible party" under the OPA for the oil discharge because Amplify Energy owns the Pipeline.

112.   The OPA provides that "each responsible party for . . . a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines . . . is liable for the removal costs and damages . . . that result from such incident." 33 U.S.C. § 2702(a).

113.   In accordance with the OPA, Amplify has set up a claims process to compensate individuals and businesses the oil spill may have harmed.  Amplify has paid claims through this process.

114.   Additionally, the class-action plaintiffs in *Gutierrez v. Amplify Energy Corp.*, 8:21 CV 01628 (C.D. Cal. Jan. 28, 2022) have brought claims under the OPA against Amplify.  *See* Consolidated Compl., ECF No. 102, ¶¶ 165–76.

115.   All Defendants' negligence proximately caused, partially caused, or otherwise contributed to the discharge because, but for the anchor-dragging incidents, the Pipeline would not have been displaced or damaged and thus would not have failed.

116.   All Defendants' negligent and/or intentional failure to warn Amplify of possible damage to the Pipeline is another proximate cause of the oil discharge.  Had Amplify known its Pipeline had been impacted by a containership's anchor, it would have taken immediate action to assess the situation, including the deployment of a remotely operated vehicle ("ROV") to inspect the Pipeline, detected its dislocation and the damage done to it, suspended operations immediately, and undertaken remedial measures that would have prevented the discharge of oil.

117.   The OPA allows "responsible parties" to seek "contribution against any other person who is liable or potentially liable under this Act or another law." 33 U.S.C. § 2709.

118.   Amplify is entitled to contribution from all Defendants because all Defendants are other "person[s]" within the definition of the OPA*, see* 33 U.S.C. § 2701(27), and are potentially liable under the OPA or another law for the oil discharge.

THIRD-PARTY VERIFIED COMPLAINT

**Count 2: Negligence Per Se (Admiralty), Against Shipping Defendants**

119.   Amplify repeats and realleges its allegations in the preceding paragraphs, as if fully set forth herein.

120.   Under the doctrine of *respondeat superior*, MSC and Dordellas Finance Corporation are vicariously liable for the acts of the MSC employees, including the captain and the crewmembers, while onboard the MSC *Danit* because maritime principals are liable for the negligent acts of their agents.   *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1233 (11th Cir. 2014).

121.   Likewise, Costamare, V.Ships Greece Ltd., and Capetanissa Maritime Corporation are vicariously liable for the acts of the Costamare and/or V.Ships Greece Ltd. employees, including the captain and the crewmembers, who were onboard the COSCO *Beijing* at the time of the anchor-dragging because maritime principals are liable for the negligent acts of their agents.

122.   The Shipping Defendants had a duty to exercise reasonable care in anchoring off the coast in the vicinity of Amplify's oil Pipeline.

123.   The Shipping Defendants' actions were negligent per se in at least two independent ways.

124.   ***First***, under federal law, the Shipping Defendants had a duty to anchor the MSC *Danit* and COSCO *Beijing* within the permissible anchorage grounds.   *See* 33 C.F.R. § 110.214(a)(4).

125.   The anchoring regulations are intended to ensure the safe passage of ships into and out of the nearby ports and to prevent vessels from damaging other vessels and surrounding facilities. *See* 33 C.F.R. § 109.05.

126.   Because the Pipeline is outside the permissible anchorage grounds, the Shipping Defendants breached their duties to remain anchored within permitted anchorage zones when the MSC *Danit* and COSCO *Beijing* dragged anchor and moved over the Pipeline.

127.   Amplify is part of the class of intended beneficiaries of the regulations because Amplify owns a facility—the San Pedro Bay Pipeline—that could be damaged by inappropriate anchoring activities.

128.   Amplify sustained injuries of the type that the anchoring regulations were designed to prevent when the MSC *Danit* and COSCO *Beijing* dragged their anchors across the Pipeline.

129.   A ship that violates a statutory or regulatory rule designed to prevent collisions is presumed to be at fault for any collision.   *See* Thomas J. Schoenbaum, 2 *Admiralty & Mar. Law* § 14:4 (6th ed., 2021 update).   Because the Shipping Defendants violated the above-discussed regulation, that rule applies here.

130.   The Shipping Defendants' violations of the anchoring regulations factually and proximately caused damages to Amplify when the ships' anchors dragged the Pipeline out of place and knocked off the Pipeline's concrete casing.

131.   ***Second***, the Shipping Defendants' failure to notify anyone of their vessels' anchor-dragging violated 33 C.F.R. § 160.216 and 46 C.F.R. § 4.05-10.

132.   Under 33 C.F.R. § 160.216, the Shipping Defendants had a duty to report hazardous conditions caused by a vessel to the Coast Guard.

133.   Under 46 C.F.R. § 4.05-10, the Shipping Defendants had a duty to "file a written report of any marine casualty required to be reported under § 4.05-1." The definition of marine casualties in § 4.05-1 includes instances where a vessel causes property damage greater than $75,000 or "an occurrence involving significant harm to the environment as defined in § 4.03-65." Section 4.03-65 defines significant harm to the environment as incidents including those that could cause "a probable discharge of oil."

134.   A duty to report the anchor-dragging incidents arose when the vessels' anchors struck the Pipeline, as the incidents constituted hazardous conditions under 33 C.F.R. § 160.216 and satisfied the requirements of 46 C.F.R. § 4.05-10.

135.   The Shipping Defendants breached their duties under 33 C.F.R. § 160.216 and 46 C.F.R. § 4.05-10 by failing to report the hazardous conditions and marine casualties they created.

136.   As owners of an oil pipeline, Amplify is within the class of beneficiaries intended to be protected by regulations requiring reporting of incidents that could cause a probable discharge of oil.

137.   The reporting regulations are designed to protect against the type of injuries Amplify suffered.

138.   The Shipping Defendants knew or should have known that the ships were dragging their anchor during the January 25 heavy weather event.   Because the Pipeline's location is well-known and well-marked by nautical maps of the area, the Shipping Defendants knew or should have known that the vessels' anchors had struck the San Pedro Bay Pipeline.

139.   The Shipping Defendants' negligence was both a factual and proximate cause of the damage to the Pipeline, the Pipeline's failure, and the eventual discharge of oil.  Had Amplify known its Pipeline had been impacted by a containership's anchor, it would have taken immediate action to assess the situation, including the deployment of an ROV to inspect the Pipeline, detected its dislocation and the damage done to it, suspended operations immediately, and undertaken remedial measures that would have prevented the discharge of oil.

140.   Insofar as the MSC Defendants' negligence compounded the Beijing Defendants' negligence, or vice versa, that also contributed to the displacement of and damage to the Pipeline and its eventual failure.

**Count 3: Negligence (Admiralty), Against All Defendants**

141.   Amplify repeats and realleges its allegations in the preceding paragraphs, as if fully set forth herein.

142.   The Shipping Defendants were grossly negligent and reckless in anchoring their ships close to an undersea pipeline during a severe weather event, failing to

properly set anchor on the seafloor, and failing to report the incident to authorities and Amplify.

143.   Marine Exchange was negligent in failing to advise or direct the ships to leave their anchorages before the storm and in failing to notify Amplify that the ships had dragged anchor while repeatedly crossing over the Pipeline.

144.   ***First***, the Shipping Defendants were negligent in anchoring the ships close to an undersea pipeline during a severe weather event, and Marine Exchange was negligent in not advising or directing the ships to leave their anchorage.

145.   The Shipping Defendants owed duties of care to Amplify to avoid positioning their vessels in a way that presented a danger to the Pipeline.

146.   The Shipping Defendants breached their duty to position the MSC *Danit* and COSCO *Beijing* so as to minimize danger the Pipeline by positioning their containerships near the Pipeline during a heavy weather event.  That in turn led to the anchor-dragging incidents, which damaged and displaced the Pipeline.

147.   It is foreseeable that a ship's anchoring activities could damage this Pipeline and other pieces of undersea property.  It is also foreseeable that strong winds may lead to anchor-dragging.

148.   The Shipping Defendants further breached their duty of ordinary care under the circumstances by failing to get underway in time to avoid a near-collision with each other and dragging anchor near the Pipeline.

149.   According to the allegations in Dordellas Finance Corporation's filing, the COSCO *Beijing* declared an intention to raise its anchor and get underway but failed to do so, which led to the MSC *Danit* aborting its own anchor-raising operation.  *See In re Application of Dordellas Finance Corp.*, No. 2:21-mc-01106-UA-PLA (C.D. Cal. Nov. 27, 2021), ECF No. 1, at 5.  If so, the Beijing Defendants' negligent conduct compounded the negligence of the MSC Defendants.

150.   Over 20 other ships handled the storm that morning by leaving their anchorages and riding out the storm in deeper waters.  That other ships capably executed

this maneuver shows that the Shipping Defendants were grossly negligent and reckless in failing to do so.

151.   Had the Shipping Defendants ridden out the storm in deeper waters, the anchors of the MSC *Danit* and COSCO *Beijing* would not have struck the Pipeline and the oil spill would not have occurred.

152.   The Shipping Defendants' breaches factually and proximately caused harm to Amplify's Pipeline when the vessels' anchors pulled the Pipeline across the seabed and stripped off its concrete casing, and thus factually and proximately caused the Pipeline's eventual failure.

153.   Marine Exchange owed a duty to Amplify, as the owner of undersea property, to advise and direct vessel traffic so as to avoid danger and damages to the Pipeline and subsequent harm to the environment.

154.   Marine Exchange breached that duty by allowing unsafe levels of ship congestion and failing to advise or order the MSC *Danit* and COSCO *Beijing* to leave their anchorages before the storm entered the bay.

155.   It is entirely foreseeable that allowing massive containerships to remain anchored near a pipeline might, in the event of a storm, result in damage to that pipeline and subsequent harm to the environment.   That is all the more true when record-breaking congestion makes it more difficult for those ships to maneuver around each other.

156.   Marine Exchange's failure to advise or direct the MSC *Danit* and COSCO *Beijing* to leave their pipeline-adjacent anchorages and ride out the storm on January 25, 2021 in deeper waters factually and proximately caused the anchor-dragging incidents that damaged and displaced the Pipeline, and in turn, caused the Pipeline's eventual failure.

157.   ***Second,*** the Shipping Defendants breached their duty of ordinary care under the circumstances by failing to set the vessels' anchors to avoid drifting and dragging anchor.

158.   Anchor-dragging may happen when a vessel's anchor is insufficiently set in the seafloor.

159.   The Shipping Defendants' failures to properly set the vessels' anchors led to the anchor-dragging incident and subsequent damage to the Pipeline.

160.   When a vessel strikes a stationary object, courts presume the vessel is at fault.

161.   The Shipping Defendants' failures to set the anchor properly caused the ships to drag anchor when winds picked up, and that anchor-dragging factually and proximately caused harm to Amplify.

162.   **Third,** the Shipping Defendants breached their duty of ordinary care by failing to report the anchor-dragging incidents.  Marine Exchange likewise breached its duty of ordinary care in failing to notify Amplify of the anchor-dragging incidents in close proximity to its Pipeline.

163.   In addition to the duties imposed by 33 C.F.R. § 160.216 and 46 C.F.R. § 4.05-10, the Shipping Defendants also owed Amplify a duty to report any "hazardous condition" or "marine casualty" event they caused.

164.   Upon information and belief, the Shipping Defendants failed to report the anchor-dragging incidents.  The Shipping Defendants at the very least did not notify Amplify.  This failure to notify constitutes a reckless disregard to consequences directly affecting Amplify's property.  The Shipping Defendants also acted in violation of a known duty to report possible marine casualties under Coast Guard regulations.

165.   Additionally, Marine Exchange owed a duty to warn Amplify of potential damages to its Pipeline from anchor-dragging vessels.

166.   Upon information and belief, Marine Exchange knew or should have known that the MSC *Danit* and COSCO *Beijing* had repeatedly crossed over the Pipeline while dragging anchor.

167.   Once Marine Exchange observed the MSC *Danit* and COSCO *Beijing* crossing the Pipeline, Marine Exchange had a duty to warn Amplify of the ships' anchor-dragging and potential damages to the Pipeline.

168.   Upon information and belief, Marine Exchange breached that duty by failing to notify Amplify that the vessels crossed the Pipeline while dragging anchor, which resulted in Amplify continuing to operate its Pipeline without knowledge of the anchor-dragging vessels' damage to and displacement of the Pipeline.

169.   Had Amplify known its Pipeline had potentially been impacted by a containership's anchor, it would have taken immediate action to assess the situation, including the deployment of an ROV to inspect the Pipeline, detected its dislocation and the damage done to it, suspended operations immediately, and undertaken remedial measures that would have prevented the discharge of oil.

170.   Marine Exchange's failure to notify Amplify of possible pipeline damage was both a factual and proximate cause of the damage to the Pipeline and its eventual failure.

171.   Each and all of these breaches were the factual and proximate causes of Amplify's injuries because, had the Shipping Defendants operated the vessels in compliance with federal law and with reasonable care under the circumstances, the Pipeline would not have been displaced nor would its concrete casing have been knocked off.  Likewise, had Marine Exchange directed the vessels to leave their anchorages before the storm came, the vessels would not have dragged anchor on the Pipeline.

172.   Further, had Amplify known its Pipeline had been impacted by a containership's anchor, it would have taken immediate action to assess the situation, including the deployment of an ROV to inspect the Pipeline, detected its dislocation and the damage done to it, suspended operations immediately, and undertaken remedial measures that would have prevented the discharge of oil.  Because of the Shipping Defendants' failure to report the anchor-dragging incidents, and because of Marine

THIRD-PARTY VERIFIED COMPLAINT

Exchange's failure to notify Amplify of those same incidents, Amplify did not know its Pipeline had been displaced or damaged. Both the dislocation of the Pipeline and the lack of the protection of the concrete casing led to its eventual failure.

173.   As a result of each and all of these grossly negligent and reckless acts, Amplify suffered damages in the form of damage done to the Pipeline and lost oil. Amplify also suffered damages to its business, including, but not limited to, lost revenue and economic opportunities, and harm to its reputation.

174.   To the extent the oil discharge harmed any plaintiffs in the litigation pending before this Court, Defendants' grossly negligent and reckless conduct were factual and proximate causes of that harm.

175.   Significant vessel traffic and congestion in the area near the Pipeline, combined with the ever-present threat of heavy weather, make future anchor-dragging incidents reasonably likely unless this Court grants the below-requested injunctive relief against Marine Exchange.

### Count 4: Trespass (Admiralty), Against Shipping Defendants

176.   Amplify repeats and realleges its allegations in the preceding paragraphs, as if fully set forth herein.

177.   Admiralty courts recognize actions for maritime trespass and trespass to chattels. *See, e.g.*, *Marastro Compania Naviera, S.A. v. Canadian Mar. Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (trespass); *Shell Offshore, Inc. v. Greenpeace, Inc.*, 2015 WL 2185111, at *2 (D. Alaska May 8, 2015) (trespass to chattels).

178.   Amplify owned much of the oil that was in the Pipeline as well as the portion of the Pipeline damaged in the anchor-dragging incident.

179.   Both the oil and Pipeline constitute chattel.

180.   The Shipping Defendants intentionally harmed Amplify's property when they dragged the vessels' anchors across the Pipeline and thereby displaced and damaged the Pipeline. And one who drags anchor while crisscrossing over a pipeline repeatedly knows that such action is substantially certain to result in property damage.

181.   That trespass damaged the Pipeline and ultimately deprived Amplify of both the use of its Pipeline and the use of its oil within the Pipeline.

182.   The Shipping Defendants are liable for the damage done to the Pipeline and for the loss of use of the Pipeline, as well as the oil lost as a result of the Shipping Defendants' trespasses.

**PRAYER FOR RELIEF**

183.   Based on the foregoing, Amplify respectfully requests the following relief:

    a.    An order directing the Shipping Defendants and Marine Exchange to pay contribution under the OPA to Amplify Energy;

    b.    All damages as allowed under applicable law, including, but not limited to, the costs to repair and replace portions of the Pipeline, lost revenue from suspended oil production, and punitive damages for Defendants' grossly negligent, reckless, willful, and/or intentional misconduct;

    c.    Costs, attorneys' fees, and expert fees as may be allowed under applicable law;

    d.    Pre-judgment and post-judgment interest on any payments awarded;

    e.    Injunctive relief requiring Marine Exchange to (1) alert Amplify and any other owners of undersea property of any and all potential anchor-dragging incidents in the area surrounding their undersea property within 24 hours of the incident and (2) not allow vessels to anchor in the anchorages located immediately adjacent to the Pipeline when heavy weather is likely;

    f.    Any other relief this Court deems just and appropriate.

**REQUEST FOR JURY TRIAL**

Amplify hereby respectfully requests a trial by jury of all causes of action and issues so triable.

33

THIRD-PARTY VERIFIED COMPLAINT

1    DATED:  February 28, 2022       Respectfully submitted,

2

3                                       */s/ Christopher W. Keegan*

Christopher W. Keegan (SBN 232045)
chris.keegan@kirkland.com
KIRKLAND & ELLIS LLP
555 California St., Suite 2900
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Daniel T. Donovan (Admitted *pro hac vice*)
ddonovan@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

Anna Rotman (Admitted *pro hac vice*)
anna.rotman@kirkland.com
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601

*Counsel for Defendants and Third-Party Plaintiffs Amplify Energy Corp., Beta Operating Company, LLC, and San Pedro Bay Pipeline Company*

VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Eric M. Willis, hereby state as follows:


1.  I am employed by Amplify Energy Corp., the Defendant/Third-Party Plaintiff in this action, holding the position and title of Senior Vice President, General Counsel & Land.


2.  I have read the foregoing Complaint and the allegations contained therein are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 28, 2022.



Eric M. Willis

THIRD-PARTY VERIFIED COMPLAINT