1   Wylie A. Aitken, State Bar No. 37770
    *wylie@aitkenlaw.com*
2   **AITKEN✦AITKEN✦COHN**
    3 MacArthur Place, Suite 800
3   Santa Ana, CA  92808
    Telephone:  (714) 434-1424
4   Facsimile:   (714) 434-3600

5   Stephen G. Larson, State Bar No. 145225
    *slarson@larsonllp.com*
6   **LARSON, LLP**
    600 Anton Blvd., Suite 1270
7   Costa Mesa, CA 92626
    Telephone: (949) 516-7250
8   Facsimile: (949) 516-7251

9   Lexi J. Hazam, State Bar No. 224457
    *lhazam@lchb.com*
10  **LIEFF CABRASER HEIMANN
    & BERNSTEIN, LLP**
11  275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
12  Telephone: (415) 956-1000
    Facsimile: (415) 956-100

13
    *Interim Co-Lead Counsel for Plaintiffs and the Proposed Classes*
14
    *[Additional Counsel Appear on Signature Page]*
15

16              **UNITED STATES DISTRICT COURT**

17             **CENTRAL DISTRICT OF CALIFORNIA**

18                    **SOUTHERN DIVISION**

19

20  PETER MOSES GUTIERREZ, JR.,        Case No. 8:21-CV-01628-DOC(JDEx)
    *et al.*,
                                       **PLAINTIFFS' FIRST AMENDED
21           Plaintiffs,               CONSOLIDATED CLASS ACTION
                                       COMPLAINT**
22  vs.
                                       1.  Strict Liability under Lempert-
23                                         Keene-Seastrand Oil Spill
                                           Prevention and Response Act,
24                                         Gov. Code § 8670, *et seq.*

25                                     2.  Violations of Oil Pollution Act,
                                           1990, 33 U.S.C. § 2701, *et seq.*
26  AMPLIFY ENERGY CORP., *et al.*,
                                       3.  Strict Liability for
27           Defendants.                   Ultrahazardous Activities (Based
                                           on California and Federal Law)
28

4. Negligence (Based on California Law)

5. Public Nuisance

6. Negligent Interference with Prospective Economic Advantage

7. Trespass

8. Continuing Private Nuisance

9. Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

**<u>DEMAND FOR JURY TRIAL</u>**

# TABLE OF CONTENTS

*Page*

I      INTRODUCTION ..................................................................................... 1

II     NATURE OF THE ACTION ................................................................... 1

III    PARTIES .................................................................................................. 6

    A.  Plaintiffs ........................................................................................... 6

    B.  Defendants ........................................................................................ 8

IV    JURISDICTION AND VENUE ............................................................. 10

V     FACTS .................................................................................................... 12

    A.  The Rich and Unique Character of the Orange County Coast ............ 12

    B.  The Elly Oil-Processing Platform and San Pedro Bay Pipeline ........ 14

    C.  Defendants Knew of the Monumental Risks Associated with Their
       Ultrahazardous Activities ................................................................ 18

    D.  Vessel Congestion in the San Pedro Bay Was a Clear and Present
       Danger to the Pipeline .................................................................... 19

    E.  The Shipping Defendants Strike the Pipeline, a Risk that Should Have
       Been Obvious to Amplify ................................................................ 23

    F.  Amplify Failed To Adequately Monitor Its Pipeline ......................... 27

    G.  The Amplify Defendants' Responsibilities Under Their Oil Spill
       Prevention Response Plan ................................................................ 29

    H.  The Amplify Defendants Have a Long History of Safety Violations  32

    I.  The Obvious Warnings of the Unfolding Oil Spill Crisis ................. 34

    J.  The Rupture ..................................................................................... 36

    K.  The Catastrophic Consequences of the Amplify Defendants' Failure to
       Detect And Stop Their Spill ............................................................. 38

       1.  The Spill's Impact on Commercial Fishing .............................. 44

       2.  The Spill's Impact on Residents .............................................. 48

**TABLE OF CONTENTS (cont.)**

*Page*

       3.     The Spill's Impact on Coastal Businesses ................................. 52

VI    PLAINTIFFS' FACTS ................................................................ 56

    A.    Commercial Fishing Class Plaintiffs ................................. 56

    B.    Real Property Class Plaintiffs ................................. 59

    C.    Waterfront Tourism Class Plaintiffs ................................. 59

VII   CLASS ACTION ALLEGATIONS ............................................. 62

VIII  CAUSES OF ACTION ........................................................ 67

    First Claim for Relief: Strict Liability under Lempert-Keene-

        Seastrand Oil Spill Prevention and Response Act,

        Government Code Section 8670, *et seq.* ................................. 67

    Second Claim for Relief: Violation of the Oil Pollution Act of

        1990, 33 U.S.C. § 2701, *et seq.* ................................. 70

    Third Claim for Relief: Strict Liability for Ultrahazardous

        Activities ........................................................ 71

    Fourth Claim for Relief: Negligence ................................. 74

    Fifth Claim for Relief: Public Nuisance ............................. 78

    Sixth Claim for Relief: Negligent Interference With Prospective

        Economic Advantage ................................................. 80

    Seventh Claim for Relief: Trespass ................................. 82

    Eighth Claim for Relief: Continuing Private Nuisance ..................... 83

    Ninth Claim for Relief: Violation of California's Unfair

        Competition Law, Cal. Bus. and Prof. Code § 17200, *et*

        *seq.* ........................................................ 84

IX    REQUEST FOR RELIEF .......................................................... 85

X     DEMAND FOR JURY TRIAL ................................................... 86

# I       INTRODUCTION

Plaintiffs John and Marysue Pedicini, individually and as trustees of the T & G Trust, Rajasekaran and Chandralekha Wickramasekaran, Donald C. Brockman, individually and as Trustee of the Donald C. Brockman Trust, Heidi M. Jacques, individually and as Trustee of the Heidi M. Brockman Trust, LBC Seafood, Inc., Qualify Sea Food Inc., Beyond Business Incorporated, d/b/a Big Fish Bait & Tackle, Josh Hernandez, John Crowe, Banzai Surf Company, LLC, Davey's Locker Sportfishing, Inc., East Meets West Excursions, Bongos Sportfishing LLC and Bongos III Sportfishing LLC, and Tyler Wayman (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Amplify Energy Corporation ("AEC"), Beta Operating Company, LLC ("BOC"), and San Pedro Bay Pipeline Company ("SPBPC") (collectively "the Amplify Defendants" or "Amplify"); *MSC Danit* (*in rem*), MSC Mediterranean Shipping Company, and Dordellas Finance Corp., the owners and operators of the *MSC Danit*; and *Cosco Beijing* (*in rem*), Costamare Shipping Co. S.A., V. Ships Greece Ltd., and Capetanissa Maritime Corporation of Liberia, the owners and operators of the *Cosco Beijing* (collectively, the "Shipping Defendants"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

# II       NATURE OF THE ACTION

1.       On Friday October 1, 2021, at 4:10 p.m., an alarm sounded on the Elly oil processing platform, which is positioned roughly eight and one-half miles off the Orange County, California coastline. The alarm, designed to alert a 24-hour surveillance crew of low-pressure in the 41-year-old, 17.5-mile-long San Pedro Bay crude oil pipeline ("Pipeline"),[1] should have triggered an immediate shut-down of the Pipeline, a step designed to protect against a crude oil spill and mitigate the impact of any rupture. However, rather than following their own Oil Spill

---

[1] The San Pedro Bay Pipeline is formally known as Pipeline P00547.

Prevention and Response Plan ("OSPRP"), a protocol that would have required the crew to alert authorities to a potential spill, Amplify's understaffed and fatigued crew, who had not been adequately trained on the automatic leak detection system, simply ignored the alarm and restarted the Pipeline. The crew then did the same thing seven more times: the automated leak detection alarm sounded again at 5:52 p.m., 7:15 p.m., 8:39 p.m., 9:23 p.m., and 10:01 p.m. Each time, Amplify's crew disregarded the alarms and the steps that they were required to take in response to a potential spill, as forth in their OSPRP, and instead kept restarting the Pipeline. After the sixth alarm sounded at 11:15 p.m., the crew finally began a manual leak detection test. Even then, rather than wait for the result, they *again* restarted the Pipeline, allowing it to pump toxic crude oil into the ocean unabated for three more hours from 11:15 p.m. to 2:27 a.m.

2.      After an eighth alarm sounded at 5:28 a.m., crew members again restarted pumping oil through the Pipeline. In doing so, the Amplify crew relied on the fact that untrained, non-Amplify personnel on a boat, who were sent out to sea in the middle of the night, could not detect evidence of an oil discharge. It was not until approximately 6:01 a.m., nearly fifteen hours after the first alarm sounded, that the Pipeline was shut down. By that time, the damage had already been done—at least 25,000 gallons of toxic crude oil had been released into the Pacific Ocean at a point roughly four and one-half miles offshore of the pristine beaches of Southern California. By Saturday evening or early Sunday morning of October 3, 2021, toxic crude oil washed ashore in Huntington and Newport Beach.

3.      AEC, the owner, and BOC and SPBPC, operator of Elly and the Pipeline and AEC's subsidiaries, failed to alert the United States Coast Guard ("Coast Guard") of the spill until 9:07 a.m. on Saturday, October 2, 2021. What makes this failure even more glaring is that many in the surrounding area recognized a problem long before the Amplify Defendants did. For example, on Friday, October 1, 2021, residents of the local beach communities began to smell

oil. The crew of at least one commercial vessel noticed an oil slick on the water in the San Pedro Bay at 6:13 p.m. and notified the National Response Center ("NRC") at 8:22 p.m. At 7:00 p.m. on Friday, October 1, 2021, as the commercial vessel made its observations, satellite imagery, identified a three-mile-wide oil "anomaly" in the San Pedro Bay. The National Oceanic and Atmospheric Administration ("NOAA"), upon receipt of this information, notified the Coast Guard of the anomaly at 2:06 a.m. on Saturday, October 2, 2021.

4.     That "anomaly" became a nightmare for the citizens and wildlife that claim the Orange County coast as their home. By the time the Amplify Defendants managed to shut down their offshore pipeline, the Pipeline had discharged at least 25,000 gallons of crude oil, creating an oil spill approximately thirteen square miles in size three miles off the coast of Newport Beach.[2] This catastrophic spill caused immediate harm to Southern California's coastal communities: within a day, the toxic oil spread through the ocean waters and made its way to Orange County's famed shoreline of pristine sand, tide pools teeming with marine life, ecological preserves, secluded coves, picturesque pleasure boat harbors, and legendary surf breaks, contaminating the all with toxic oil. From Seal Beach in the north to Dana Point to the South, ocean currents carried the toxic oil to the shoreline, forcing the closure of beaches, ports, fishing grounds, shellfish and fishing operations.  The toxic oil soiled previously lucrative offshore fishing blocks, killing fish, larvae, and damaging critical vegetation necessarily for a healthy fishing ecosystem.  The oil then oozed onto shore, invading coastal private properties.

5.     Fishing and businesses that rely on coastal fishing were devastated as approximately 650 square miles of marine waters and approximately *45 miles* of

---

[2] Southern California Oil Spill Response, Newport Beach Oil Spill Response (Initial Unified Command Release) (Oct. 3, 2021), https://socalspillresponse.com/newport-beach-oil-spill-response-initial-unified-command-release/; Laylan Connelly, *Authorities announce cleanup of October's oil spill off Orange County complete*, THE ORANGE COUNTY REGISTER (Dec. 28, 2021, 11:11 a.m.), https://www.ocregister.com/2021/12/28/authorities-announce-cleanup-of-octobers-oil-spill-off-orange-county-complete/?clearUserState=true.

shoreline were closed to fishing.[3] And, as a result of the physical damage that the spill caused to the shoreline, and the related closures required to contain the spill and facilitate its clean-up, a wide variety of businesses that rely on the fishing ecology and beachfront for their survival were hit with a second disaster: They were unable to operate their businesses and/or their customers disappeared. Further, compounding these losses, to facilitate clean-up efforts, the popular Great Pacific Airshow, which was to take place on Sunday October 3, 2021, was canceled, robbing businesses of one of their most profitable days of the year.

6.      The formerly pristine waters impacted by the spill are home to hundreds of sensitive animal species, including whales, dolphins, and sea turtles, as well as bountiful schools of commercial fish and shellfish that serve as the backbone for the local commercial fishing industry, sports fishing, and whale watching industries. These industries rely on the healthy aquatic life of this delicate offshore ecosystem. Defendants' catastrophic spill upended that delicate equilibrium. Its effects will affect the livelihoods of these formerly vibrant local communities well into the future. While the impact on animal species is difficult to measure, rescue workers recovered many oiled and dead animals, including more than 80 dead birds, and six dead marine mammals.[4]

7.      The wildlife and the commercial industries that rely on wildlife were not the only victims of this disaster. Property owners and lessees along the coast pay a premium to enjoy the benefits of beachfront living. The thousands of gallons of toxic crude oil that washed onto their beaches fouled their properties, the water

---

[3] Cal. Dept. of Fish and Wildlife, Declaration of Fisheries Closure (October 7, 2021), https://socalspillresponse-com-jtti.s3.us-west-2.amazonaws.com/wp-content/uploads/2021/10/07174741/CDFW-Declaration-Amendment_2_10.07.21.pdf (last visited Jan. 25, 2022).
[4] Univ. of Cal., Davis, Veterinary Medicine, Oiled Wildlife Care Network, Pipeline P00547 Incident Wildlife Numbers, https://owcn.vetmed.ucdavis.edu/pipeline-p00547-incident (last visited Jan. 25, 2022).

they swim in, the sand and beach activities they enjoy, and their incomparable views.

8.     On December 29, 2021, nearly three months after the disaster and following a massive clean-up effort involving 1,800 people, the Coast Guard, the California Department of Fish and Wildlife ("CDFW") and Orange and San Diego counties, authorities announced that clean-up efforts were complete.[5] However, this announcement did not mean that the spill's damage has been eradicated. It meant only that the most glaring impacts of the spill had been addressed: There is no question that many gallons of unrecovered oil from the spill continue to foul the ocean and harm the ecosystem.

9.     The Amplify Defendants could have averted this disaster. Their Pipeline's leak-detection system, per Amplify's own admission, malfunctioned.[6] Their failure to maintain and monitor the Pipeline, coupled with their reckless disregard of pending threats to it, led to its rupture. Moreover, their cataclysmic failure to discover and address their own leak for many hours turned what could have been a containable problem into an unmitigated environmental disaster.

10.     The Amplify Defendants either lacked or ignored the basic industry-standard safety equipment that would have recognized the telltale signs of a spill: a decrease in the pressure of the Pipeline and a change in the flow rate of oil. As recently as 2016, the Amplify Defendants claimed that their safety system would detect a spill of this magnitude in a matter of minutes. Instead, local residents,

---

[5]  Southern California Oil Spill Response, Newport Beach Oil Spill Response (Initial Unified Command Release) (Oct. 3, 2021), https://socalspillresponse.com/newport-beach-oil-spill-response-initial-unified-command-release/; Laylan Connelly, *Authorities announce cleanup of October's oil spill off Orange County complete*, THE ORANGE COUNTY REGISTER (Dec. 28, 2021, 11:11 a.m.), https://www.ocregister.com/2021/12/28/authorities-announce-cleanup-of-octobers-oil-spill-off-orange-county-complete/?clearUserState=true.

[6]Robert Burnson, *Amplify Energy Charged Over California's Worst Oil Spill in Nearly 30 Years*, BLOOMBERG GREEN (Dec. 15, 2021, 6:04 p.m.), https://www.bloomberg.com/news/articles/2021-12-16/amplify-energy-charged-with-negligence-in-san-diego-oil-spill.

fishermen, and other entities were the first to learn of the spill and notify authorities after smelling toxic oil and seeing a massive oil sheen on the water.

11. Because the Amplify Defendants failed to detect the spill, they also failed to stop pumping copious amounts of oil through the ruptured Pipeline and failed to close valves that could have prevented oil from escaping. Amplify did not notify the authorities until over *15 hours* after the spill began—and only after consulting the company's risk management firm[7]—impeding clean-up efforts and violating the Amplify Defendants' own policies. The Amplify Defendants' incompetence and callous disregard of industry-standard safety measures permitted the disaster to occur and continue to engulf Orange County.

12. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on their own behalf and as representatives of others similarly situated to recover significant losses they have incurred and will continue to incur because of Defendants' misconduct.

### III    PARTIES

#### A. <u>Plaintiffs</u>

13. Plaintiffs Donald C. Brockman ("Brockman") and Heidi M. Jacques ("Jacques") are residents and citizens of Orange County, California. Mr. Brockman is the trustee of the Donald C. Brockman Trust and Ms. Jacques in the trustee of the Heidi M. Brockman Trust. Brockman and Jacques are commercial fishers and are members of and seek to represent the Commercial Fishing Class.

14. Plaintiff LBC Seafood, Inc. ("LBC Seafood") is a California Corporation doing business in Long Beach, California. LBC Seafood is a family-owned, international seafood wholesale business. LBC Seafood is a member of and seeks to represent the Commercial Fishing Class.

---

[7] Anita Chabria, et al., *Pipeline company evades questions over a 15-hour gap before reporting oil spill*, LOS ANGELES TIMES (Oct. 9, 2021, 5:00 a.m.), https://www.latimes.com/california/story/2021-10-09/oil-spill-timeline-questions-contradictions.

15.     Plaintiff Qualify Sea Food Inc. (hereinafter "Qualify Sea Food") is a California corporation doing business in Redondo Beach, California. Quality Sea Food is a historic seafood market operating since 1953, engaged in the sale and distribution of commercial retail seafood. Quality Sea Food is a member of and seeks to represent the Commercial Fishing Class.

16.     Plaintiff Josh Hernandez ("Hernandez") is a resident and citizen of Capistrano Beach, California, and is in the business of commercial fishing out of Dana Point, California. Hernandez is a member of and seeks to represent the Commercial Fishing Class.

17.     Plaintiff John Crowe ("Crowe") is a resident and citizen of King Harbor, Redondo Beach, California, and is in the business of commercial fishing. Crowe is a member of and seeks to represent the Commercial Fishing Class.

18.     Plaintiffs John and Marysue Pedicini, as individuals and trustees of the T & G Trust, are residents and citizens of Newport Beach, Orange County, California, where they own and reside in their waterfront property. The Pedicinis are members of and seek to represent the Real Property Class.

19.     Rajasekaran and Chandralekha Wickramasekaran (the "Wickramasekarans") are residents and citizens of California. They are the Co-Trustees of The Wickramasekaran Family Trust and owners of a waterfront, duplex property located in Newport Beach, California. The Wiskramasekarans are members of and seek to represent the Real Property Class.

20.     Plaintiff Beyond Business Incorporated ("BBI"), d/b/a Big Fish Bait & Tackle ("BFBT"), is a California corporation located 1780 Pacific Coast Highway, Seal Beach, California. BFBT is engaged in the sale of fishing and related supplies. BBI is a member of and seeks to represent the Waterfront Tourism Class.

21.     Plaintiff Banzai Surf Company, LLC (hereinafter "Banzai Surf") is a California limited liability company doing business in Huntington Beach, California. Banzai Surf is a year-round surf school that operates on Huntington

State Beach, California. Banzai Surf is a member of and seeks to represent the Waterfront Tourism Class.

22.    Plaintiff Davey's Locker Sportfishing, Inc. ("Davey's Locker") is a California corporation doing business in Newport Beach, Orange County, California. Davey's Locker is in the business of providing sportfishing and whale and dolphin watching charters. Davey's Locker is a member of and seeks to represent the Waterfront Tourism Class.

23.    Plaintiff East Meets West Excursions ("East Meets West") is a California limited liability company doing business in Newport Beach, Orange County, California. East Meets West is in the business of providing whale and dolphin watching charters. East Meets West is a member of and seeks to represent the Waterfront Tourism Class.

24.    Plaintiffs Bongos Sportfishing LLC and Bongos III Sportfishing LLC (collectively "Bongos") are California limited liability companies doing business in Newport Beach, Orange County, California. Bongos is in the business of providing sportfishing charters. Bongos is a member of and seeks to represent the Waterfront Tourism Class.

25.    Plaintiff Tyler Wayman ("Wayman") is a resident and citizen of Costa Mesa, California. Wayman is a fulltime, licensed commercial boat captain, and private contractor. Wayman is a member of and seeks to represent the Waterfront Tourism Class.

**B.    Defendants**

26.    Defendant Amplify Energy Corp. is a corporation formed in Delaware with its headquarters and principal place of business in Houston, Texas.

27.    Defendant Beta Operating Company, LLC, doing business as Beta Offshore, is a limited liability corporation formed in Delaware with its headquarters and principal place of business in Long Beach, California. Defendant Beta Operative Company, LLC, is a subsidiary of Defendant Amplify Energy Corp.

28.     Defendant San Pedro Bay Pipeline Company is a corporation formed in California with its headquarters and principal place of business in Long Beach, California. Defendant San Pedro Bay Pipeline Company is a subsidiary of Defendant Amplify Energy Corp.

29.     The Amplify Defendants are private businesses, engaged in the business of transporting oil to private entities for commercial purposes. Amplify Defendants own and/or operate three offshore oil platforms and a 17.5-mile pipeline off the coast of Southern California. Amplify Defendants own and/or operate the three oil platforms, known as Elly, Ellen, and Eureka. SPBPC owns and operates the 17.5-mile Pipeline that transports crude oil from the Elly platform to the Port of Long Beach. AEC is the parent company of both SPBPC and BOC. Martyn Willsher is the Chief Executive Officer for AEC, BOC and SPBPC.

30.     Defendant *MSC Danit* is a Panama-flagged vessel being sued *in rem*. The *MSC Danit* is a "New-Panamax"-sized containership, measuring nearly 1,200 feet (366 meters) long and almost 170 feet (52 meters) wide with a deadweight of over 165,000 tons and a carrying capacity of about 14,000 shipping containers, whose anchor and/or anchor chain struck the Pipeline on or about January 25, 2021 during a heavy weather event that impacted the Ports of Los Angeles and Long Beach. When built in 2009, the *MSC Danit* was among the largest ships in the world. The MSC Danit's International Maritime Organization ("IMO") number is 9404649.

31.     MSC Mediterranean Shipping Company ("MSC") operates the *MSC Danit*, MSC is headquartered in Geneva, Switzerland.

32.     Dordellas Finance Corp. owns the *MSC Danit*, and is a Panamanian corporation.

33.     Defendant *Cosco Beijing* is a Malta-flagged vessel being sued *in rem*. The *Cosco Beijing* measures about 1,150 feet (350 meters) long and about 140 feet (42.8 meters) wide with a deadweight of over 107,000 tons and a carrying capacity

of over 9,000 shipping containers, whose anchor and/or anchor chain struck the Pipeline on or about January 25, 2021. The *Cosco Beijing*'s IMO is 9308508.

34.    Costamare Shipping Co. S.A. ("Costamare") operates the *Cosco Beijing*. Costamare is headquartered in Greece.

35.    Defendant V. Ships Greece Ltd. ("V. Ships") also operates the *Cosco Beijing*. V. Ships is headquartered in Greece and incorporated under the laws of Bermuda.

36.    Capetanissa Maritime Corporation of Liberia, owns the *Cosco Beijing*.

37.    The Shipping Defendants were involved in a January 25, 2021 anchor-dragging and strike incident during a heavy weather event that impacted the Ports of Los Angeles and Long Beach. Both the *Danit* and the *Beijing* repeatedly crossed over the subject Pipeline during the storm while both vessels were "at anchor", and within United Stated territorial waters. On information and belief, the anchor-dragging incident damaged the subject Pipeline.

## IV    JURISDICTION AND VENUE

38.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2). The federal district courts maintain original jurisdiction over class action lawsuits wherein the amount in controversy exceeds five million dollars and any member of the Class is a citizen of a state different from any Defendant in the matter. 28 U.S.C. § 1332(d)(2)(A). Plaintiffs allege beyond the minimum five million dollars in damages as a result of the spill. Plaintiffs, all citizens of California, are diverse from AEC and BOC, citizens of Texas. SPBPC is a wholly owned subsidiary of AEC.

39.    This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 2717(b), because Plaintiffs bring claims under the Oil Pollution Act.

40.    This Court has personal jurisdiction over all Defendants. The Amplify Defendants are registered to conduct business in California, and do regularly

conduct business there. Defendants MSC Mediterranean Shipping Company, Dordellas Finance Corporation, Costamare Shipping Co. S.A., and Capetanissa Maritime Corporation of Liberia (collectively, the "Shipping Defendants") own and operate two massive container ships, the *MSC Danit* and the *Cosco Beijing*. In the days leading up to January 25, 2021, the two container ships were at anchor in the territorial waters of the United States. Specifically, they were anchored just outside the Port of Long Beach, California, where they were waiting to either enter the Port of Long Beach and/or the Port of Los Angeles and conduct business there, or had just left the Port of Long Beach and/or the Port of Los Angeles, having conducted business there.

41. The ships had entered US territorial waters to conduct business in the ports of the California, and therefore the Shipping Defendants purposefully directed their activities toward the United States, and specifically, Southern California and this District. For this same reason, they also purposefully availed themselves of the privileges of conducting activities in California.

42. This case arises from the Shipping Defendants' conduct, and the effects of that conduct, in California. The *MSC Danit* and the *Beijing* were involved in a January 25, 2021 anchor-dragging incident during a heavy weather event that impacted the Ports of Los Angeles and Long Beach. Both the *MSC Danit* and the *Beijing* repeatedly crossed over the subject pipeline during the storm while both vessels were at anchor, and within United Stated territorial waters. On information and belief, the anchor-dragging incident damaged the subject pipeline. The claims in this action against the Shipping Defendants thus directly arise out of or relate to their forum-related activities. There is a direct affiliation between the business that the *MSC Danit* and *Beijing* conducted in the Ports of Los Angeles and/or Long Beach and the oil spill directly offshore. On information and belief, but-for the *MSC Danit* and *Beijing*'s anchor-dragging, the Pipeline would not have ruptured and the Plaintiffs would have not have suffered the injuries they suffered. The

exercise of jurisdiction over the Shipping Defendants is reasonable for all these reasons.

43.     For these reasons, the Court also has *in rem* jurisdiction over the *MSC Danit* and *Cosco Beijing*. Moreover, the Court has *in rem* jurisdiction based on letters of undertaking these ships have with the Amplify Defendants.

44.     Further, this Court is also the proper venue for this matter because a substantial amount of Defendants' conduct occurred in this District, a substantial part of the property that is subject to this litigation is located in this District, and because Defendants have caused harm to Plaintiffs who reside in and were harmed in this District. *See* 28 U.S.C. § 1391.

## V     FACTS

### A.     The Rich and Unique Character of the Orange County Coast

45.     From Seal Beach down to Dana Point, the coastal regions of Orange County offer beautiful and pristine beaches to residents and travelers from all over the world. Residents and visitors pay a premium to live in and travel to these stunning areas for the opportunity to appreciate and take advantage of the beaches, waters, and views. Throughout the year, residents and visitors utilize the beach communities for entertainment, such as family outings or surfing events; recreation, such as kayaking, surfing, sailing, boating, and biking; dining on local seafood; and marine charter excursions, such as whale and dolphin watching, sportfishing and sunset cruises. (*See* Images 1-3 below).







**Image 1**, Huntington Beach, Courtesy of *Willyou.net*

**Image 2**, Dana Point, Courtesy of *Trip Advisor*

**Image 3**, Newport Beach, Courtesy of *The Travel Mag.*

46.     The Orange County tidepools, wetlands, and coastal waters offer an abundance of diverse animal life, from fish and birds to lobsters and sea lions. The Talbert Marsh Ecological reserve, a 25-acre restored wetland, serves as a critical link in migratory bird routes and is home to at least 90 species of shorebirds[8], including great blue herons, pelicans, and endangered California Least Terns, which migrate up the Pacific Coast. Tidepools, flourishing with everything from starfish and crabs to sea urchins and snails, provide a glimpse into the delicate ecological balance of the coast. The coastal waters—a draw for enumerable reasons—are flush with various fish species, *e.g.,* surf perch, corbina, and halibut, as well as other marine life, *e.g.,* killer whales, humpback whales, dolphins, sharks, and seals.

47.     More than merely an outlet for a breathtaking experience, the Orange County coast is a source of work and income for thousands of people. Huntington and Newport Beach alone generate roughly two billion dollars yearly from tourism, which supports thousands of jobs within those communities. Businesses on beaches or harbors—such as restaurants, hotels, retail stores, harbor tours, special beach

---

[8] Rachel Becker, *A rare ecological gem is slicked with spilled oil – again*, CAL MATTERS (Oct. 5, 2021), https://calmatters.org/environment/2021/10/california-oil-spill-talbert-marsh/.

events, and niche boutiques, to name a few—are a fundamental part of the coastal economy. Fishers, including those who catch or harvest fish and/or shellfish along the Orange County coast, and businesses that re-sell the catch, are a vital community component. This group, who source local businesses and beyond with fresh seafood, is dependent on the availability of all types of sea life, including lobster, squid, sea bass, sculpin, tuna, halibut, yellowtail, and more.

48.    The documented value of Orange County's ocean economy, including tourism, recreation, construction, and fishing industries (excluding oil and gas) is $4.1 billion. Orange County's ocean economy provides 57,348 jobs.[9]

**B.    The Elly Oil-Processing Platform and San Pedro Bay Pipeline**

49.    The Amplify Defendants own and operate at least three offshore platforms off the coast of Southern California—the Eureka, the Elly, and the Ellen—which are roughly nine miles offshore. (*See* Images 4-5.) Amplify's Pipeline transports crude oil from these offshore platforms to Long Beach, where the oil is distributed to market. The Eureka and Ellen platforms pull oil from the Beta Field, an oil reserve, and pump this oil to the Elly, a processing platform, by means of an underground pipeline. From Elly, the oil is transported to shore through the 17.5-mile Pipeline. As the Pipeline moves inland, the crude oil transport line sits less than 100 feet below the sea level, mere miles from the Orange County coastline.

---

[9] *See* Bus. Alliance for Protecting the Pacific Coast, *Orange County's Ocean Economy* (Oct. 2021), https://e2.org/wp-content/uploads/2021/10/Orange-County-Oil-Spill-Fact-Sheet-Final.pdf (last visited Jan. 25, 2022).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Image 4.** Beta Unit Complex Diagram



**Image 5.** Beta Unit Complex,
Courtesy of *Los Angeles Times*

50.     The oil system, referred to at the Beta Unit Complex, was constructed in 1980. The exterior of the Pipeline consists of a .375-inch-thick concrete casing. The interior section consists of a .500-inch-thick, X-42 grade carbon steel line pipe. Prior to the rupture, the Pipeline was reported to be operating at approximately 300-400 pressure per square inch gauge ("psig").[10] The Pipeline traverses a High Consequence Area ("HCA") as defined in 49 C.F.R. § 195.450, which means an area where an oil spill could have greater consequences to health and safety or the environment, and an ecologically unusually sensitive area as defined in Section 195.6. Operators of pipelines in an HCA must take special precautions to prevent a spill and mitigate its impacts.

51.     Per the Amplify Defendants' own records, the Beta Unit Complex was producing roughly 3,600 barrels (151,200 gallons) of crude oil per day in the

---

[10] U.S. Dept. of Trans. Pipeline and Hazardous Materials Safety Admin., Corrective Action Order, CPF No. 5-2021-054-CAO (Oct. 4, 2021), https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2021-10/Beta%20Offshore%20CAO.10.04.2021.pdf.

second quarter of 2021, making it the second largest offshore oil-producer in California. As such, if 25,000 gallons of crude oil was spilled over twenty-four hours (the actual number could be higher), that would amount to a substantial reduction in the amount of crude oil transported from the Beta Unit Complex to the Long Beach storage facility. This begs the question: how could the Amplify Defendants have failed to notice such a significant drop in their own production numbers? Worse, how could the Amplify Defendants have allowed this to happen in the high-consequence area of the Orange County coast?

52.     The Amplify Defendants were required to have, and purportedly did have, sensors to monitor irregularities and/or failures in the transportation of crude oil through the Pipeline. According to two former employees, Amplify purportedly had software designed specifically for the oil system to monitor the status of pressure at pumps along the Pipeline.[11] Sensors were utilized to measure pressure and flow rate within the Pipeline. Per the Defendants' Oil Spill Prevention and Response Plan ("OSPRP"), under the heading "Leak Detection Systems," "Alarms are initiated if volume balance discrepancies vary beyond specific short-term and long-term limits."[12] The Pipeline was purportedly continuously monitored; any detected anomalies via automated monitoring were directly reported to the control rooms at the Elly and Beta Pump Station (staffed 24 hours/day).

53.     The crew who staffed the control rooms at the Elly and Beta Pump Station should have been trained to identify any and all problems related to any oil spill, as a check on the automated system. According to a former employee who is

---

[11] Jessica Resnick-ault and Nichola Groom, *Despite preparation, California pipeline operator may have taken hours to stop leak*, REUTERS (Oct. 8, 2021, 2:46 p.m.), https://www.reuters.com/business/energy/despite-preparation-california-pipeline-operator-may-have-taken-hours-stop-leak-2021-10-08/.

[12] Beta Offshore, Beta Unit Complex, *Oil Spill Prevention and Response Plan*, (Apr. 2012), https://www.bsee.gov/sites/bsee.gov/files/oil-spill-response-plan-osrp/inspection-and-enforcement/beta-operating-company-osrp-april-2012.pdf ("2012 OSPRP").

familiar with the Amplify Defendants' oil system, if operators "detected a single barrel [loss], the [P]ipeline should have been shut [down]."[13]

**C.**   **Defendants Knew of the Monumental Risks Associated with Their Ultrahazardous Activities**

54.    A 2017 Environmental Assessment ("EA"), entitled Beta Unit Geographical Survey, should have made the Amplify Defendants acutely aware of the hazardousness of their activities in the Beta Field.[14] Under the heading "Hazardous Materials/Risk of Upset," the Amplify Defendants were warned that the area where their oil system is located is  "utilized for recreational, industrial, and commercial purposes."[15] It specifically stated, "[g]iven the proximity of the Project survey area to the [Ports of Los Angeles and Long Beach] and offshore vessel traffic lanes, a discussion of hazardous materials and potential risks of upset is provided below."[16] The EA goes on to state: "The primary statutes, regulations, plans, and policies relevant to the Project that address potential risk of upset related to hazardous materials is provided" below, and provides a list of major international, federal, and state regulations designed to keep the public and environment safe.

55.    Miles of the Amplify Defendants' San Pedro Bay Pipeline, including the likely location of the oil spill, are less than five miles off the Orange County coast. The last two miles are directly within and under the City of Long Beach,

---

[13] Jessica Resnick-ault and Nichola Groom, *Despite preparation, California pipeline operator may have taken hours to stop leak*, REUTERS (Oct. 8, 2021, 2:46 p.m.), https://www.reuters.com/business/energy/despite-preparation-california-pipeline-operator-may-have-taken-hours-to-stop-leak-2021-10-08/ ("Reuters, Hours to Stop Leak").

[14] U.S. Dept. of the Int., Bureau of Ocean Energy Mngt., Beta Operating Company, LLC, *Application for Permit to Conduct Geological or Geophysical Exploration for Mineral Resources or scientific Research on the Outer Continental Shelf* (Dec. 7, 2017), https://www.boem.gov/sites/default/files/about-boem/BOEM-Regions/Pacific-Region/Geological-and-Geophysical-Data/Section-3.9-Haz-Mat-Risk-of-Upset-110617.pdf.

[15] *Id.*

[16] *Id.*

through piers G and H. The transportation of crude oil laced with ultra-toxic additives through the Pipeline carries with it extraordinary risks to the safety of the general public, the economic welfare of the surrounding communities, and an HCA and unusually sensitive ecological area.

56.     Amplify's 2012 OSPRP explicitly states: "The San Pedro Bay Pipeline . . . is considered to be capable of causing significant and substantial harm to the environment in the event of a discharge of oil because of its proximity to navigable waters and adjoining shoreline areas designated as environmentally sensitive . . . ."[17] Beyond the obvious geographical risks to the Orange County coastline, the San Pedro Bay is home to the Ports of Long Beach and Los Angeles, the two largest container ports in the United States.[18] As discussed below, since the beginning of the COVID-19 pandemic in early 2020, the number of vessels to enter and anchor in the San Pedro Bay ballooned, significantly elevating the risk of harm from any spill.[19]

**D.     Vessel Congestion in the San Pedro Bay Was a Clear and Present Danger to the Pipeline**

57.     In early 2020, the COVID-19 pandemic impacted the United States' supply chains. The Ports of Los Angeles and Long Beach, *the* busiest ports in the country, were not spared. Massive ships, from oil tankers[20] to container vessels[21],

---

[17] 2012 OSPRP, fn. 12.

[18] The Port of Los Angeles, *San Pedro Bay Ports Announce New Measure to Clear Cargo Containers that Linger on Terminals* (Oct. 25, 2021), https://www.portoflosangeles.org/references/2021-news-releases/news_102521_jointclearcargo.

[19] Sam Dean, *Is the ports logjam really getting better? The numbers don't tell the whole story*, LOS ANGELES TIMES (Dec. 3, 2021, 5:00 a.m.), https://www.latimes.com/business/story/2021-12-03/officials-say-the-ports-logjam-is-easing-but-numbers-dont-tell-the-whole-story ("LAT, Port Logjam").

[20] MARINELINK, *Surge in Oil Tankers at Anchor Off California* (Apr. 24, 2020), https://www.marinelink.com/news/surge-oil-tankers-anchor-off-california-477901.

[21] Mediha DiMartino, *Ports See 'Unprecedented Amount of Cargo Volume'*, LOS ANGELES BUS. JOURNAL (Dec. 21, 2020), https://labusinessjournal.com/news/2020/dec/21/ports-see-unprecedented-amount-cargo-volume/.

idled for days in the San Pedro Bay. Congestion in the San Pedro Bay grew exponentially in 2021. By October 2021, the number of massive vessels awaiting entry into the ports eclipsed all previous records.[22] With cargo vessels utilizing anchors that can weigh tens of thousands of pounds, each anchored ship represented a major destructive threat to the pipeline.

58.    Indeed, large vessels, *e.g.*, the *MSC Danit* and *Cosco Beijing*, utilize anchors that can weigh up to 30 tons, with thick heavy chains that can reach hundreds of feet long, and can dig 10 feet deep into offshore sediment.[23]

59.    The numerous cargo ships routinely anchored along the length of the San Pedro pipeline presented a known risk to the Pipeline that all Defendants should have taken steps to address. Image 6 below demonstrates the numerous ships at anchor near the Pipeline on October 2, 2021.

---

[22] LAT, Port Logjam, fn. 19; Dani Anguianco, *A record number of cargo ships are stuck outside L.A. What's happening?*, THE GUARDIAN (Sept. 23, 2021, 10:00 a.m.), https://www.theguardian.com/us-news/2021/sep/22/cargo-ships-traffic-jam-los-angeles-california.

[23] Clearseas.org, *Anchors Away: Understanding the Issues About Ships at Anchor*, https://clearseas.org/en/blog/anchors-away-understanding-the-issues-about-ships-at-anchor/ (last visited Mar. 17, 2022).

**Image 6.** Aerial Diagram

60.     Ship anchors dragging across the seabed have previously caused pipeline ruptures, particularly in heavily trafficked waters near ports.[24] Since 1986, at least 17 accidents on pipelines carrying crude oil or other hazardous liquids have been linked to anchor strikes or suspected anchor strikes.[25]

61.     The location of underwater pipelines, including the Pipeline at issue, is well-known. Underwater pipelines are clearly marked on nautical navigation charts

---

[24] *See* Christine Mai-Duc and Christopher Matthews, *California Oil Spill May Have Been Caused by Anchor Hitting Pipeline*, THE WALL STREET JOURNAL, (Oct. 4, 2021, 3:20 p.m.), https://www.wsj.com/articles/california-oil-spill-results-in-beach-harbor-fishery-closures-11633376943.

[25] *See* Michael R. Blood, et al., *California pipeline likely damaged up to a year before oil spill*, ASSOCIATED PRESS (Oct. 8, 2021), https://apnews.com/article/business-los-angeles-california-environment-and-nature-e3b2976b1986e0f4f2908cedc18f2854.

and maps.[26] Furthermore, large container vessels are usually equipped with sophisticated navigational and radar technologies to avoid shallow seas, other vessels, and underwater objects. The grave risk to the integrity of the Pipeline posed by ship anchorages was a concern even before the Pipeline was built. The California Coastal Commission's May 24, 1979 permit for the Pipeline contained a special condition: Pipeline Burial. The permit states, "the off-shore [P]ipeline *shall be buried a minimum of ten feet below the sea floor in Coast Guard-identified anchorage areas within the Long Beach breakwater*, unless the Corps of Engineers in consultation with the U.S. Coast Guard determine that a greater depth would be necessary to provide adequate protection from the spillage of crude oil."[27] (Italics added.)

62.    The staff report that accompanied the permit explained the reason for the burial requirement: "Pipeline damage due to anchor dragging has been one of the major causes of subsea pipeline rupture in off-shore oil operations."[28] In addition, the Amplify Defendants were on notice that the Pipeline could be damaged. As documented in a presentation by the Federal Bureau of Safety and Environmental Enforcement ("BSEE") which works to promote pipeline safety, there was a history of dents in the Pipeline which required repair.[29]

---

[26] *See id; see also* Mike Soraghan, *Pipeline owner kept 'in the dark' on possible anchor strike*, E&E NEWS – ENERGY WIRE (Dec. 17, 2021, 4:24 a.m.), https://www.eenews.net/articles/pipeline-owner-kept-in-the-dark-on-possible-anchor-strike/.

[27] 154-79 Final Permit at page 2.

[28] 154-79 Staff report at 5.

[29] Theresa Bell, et al., *Overcoming the Challenges to Intelligently Pig the Unpiggable, Platform Elly to Shore Oil Pipeline Case Study*, Prevention First 2008 (Sept. 2008), at p. 12, https://www.slc.ca.gov/wp-content/uploads/2018/08/PF2008-Pipeline-Overcoming.pdf.

**E.      The Shipping Defendants Strike the Pipeline, a Risk that Should Have Been Obvious to Amplify**

63.      During the week of October 4, 2021, investigators discovered a 13-inch, linear fracture in the Pipeline, roughly four-and-a-half miles offshore. (*See* Images 7-9.) Investigators further noted that a 4,000-foot section of the Pipeline, where the damage was found, had been moved roughly 105 feet from its original resting point. (*See* Image 9.) Investigators now believe the manipulation of and damage to the Pipeline occurred on January 25, 2021, when two container ships, the *MSC Danit* and *Beijing* allowed their anchors to collide and/or become entangled with the Pipeline.



**Image 7.** 13-inch Fracture (1)



**Image 8.** 13-Inch Fracture (2)

**Image 9.** Movement of Pipeline

64.     In the days leading up to January 25, 2021, the *MSC Danit* and *Beijing,* two massive container ships with deadweights of 165,000 tons and 107,000 tons, respectively, dropped anchor near the Pipeline and just outside the Port of

Long Beach. They remained within their respective anchor points—called "swing circles"—until the early morning hours of January 25, 2021.

65.     The *MSC Danit*'s and *Beijing*'s crews knew that they were anchored near the Pipeline, which is marked on the applicable nautical navigation map for the San Pedro Channel. That map contains this specific warning: "Not all submarine pipelines and submarine cables are required to be buried, and those that were originally buried may have become exposed. Mariners should use extreme caution when operating vessels in depths of water comparable to their draft in areas where pipelines and cables may exist, and when anchoring, dragging or trawling."[30] Thus, the Shipping Defendants had a duty to avoid striking the Pipeline.[31]

66.     In the early morning hours of January 25, 2021, a winter storm hit the Los Angeles and Orange County area, which broadcasts had warned would be a winter storm and "high wind event."[32] Two dozen other vessels pulled their anchors and sailed out to sea to ride out the storm.[33] However, the *MSC Danit* and *Beijing* chose to remain "at anchor" during the storm, and as a result drifted erratically while dragging their respective anchors across the ocean floor. Indeed, both the *MSC Danit* and the *Beijing* broke their anchorage "swing circles" in the early morning hours of January 25, 2021.

67.     During the *MSC Danit*'s and *Beijing*'s uncontrolled and dangerous drifts, the container ships repeatedly crossed over the Pipeline. Both vessels broadcasted that they were "at anchor," while repeatedly crossing over the Pipeline

---

[30] Nat. Oceanic and Atmospheric Admin., Chart of San Pedro Bay, https://www.charts.noaa.gov/PDFs/18749.pdf (last visited Jan. 25, 2022).
[31] "[W]hen a mariner knows of obstructions to navigation, he must avoid them." *Gough v. Nat. Gas Pipeline Co. of Am.*, 996 F.2d 763, 768 (5th Cir. 1993).
[32] Dr. James A. Fawcett, *Vessel Anchoring*, University of Southern California (Oct. 28, 2021), https://dornsife.usc.edu/uscseagrant/16-vessel-anchoring/.
[33] *See* Robert Tuttle, *U.S. Coast Guard Boards Vessel That Dragged Anchor Near Pipeline*, BNN BLOOMBERG (Oct. 17, 2021), https://www.bnnbloomberg.ca/u-s-coast-guard-boards-vessel-that-dragged-anchor-near-pipeline-1.1667570.

with their anchors dragging along the ocean floor. (*See* Image 10.) The *MSC Danit* and *Beijing*, together, moved back and forth over the Pipeline at least nine (9) times. More specifically, on information and belief, at or around 5:47 a.m., the MSC Danit crossed over the Pipeline; it then crossed over the Pipeline several more times over the next three hours. The *Cosco Beijing* was also in the area, given that it came within about 560 feet of the *MSC Danit*.[34] The *Cosco Beijing* also repeatedly crossed over the Pipeline. As a result, a 4,000-foot section of the Pipeline was displaced, with a maximum displacement of 105 feet.



**Image 10.** Shipping Defendant Movement
(Blue represents the Beijing; Red represents the MSC Danit)

68.     As a result of the *MSC Danit*'s and *Beijing*'s uncontrolled drifts while "at anchor," the *MSC Danit*'s and/or the *Beijing*'s anchor(s) and/or anchor chain(s) struck the Pipeline. The lateral movement of the *MSC Danit* and Beijing near the

---

[34] *In re Application of Dordellas Finance Corp.*, No. 2:21-mc-01106-UA-PLA (C.D. Cal. Nov. 27, 2021), ECF No. 1, at 5.

Pipeline suggests that the *MSC Danit*'s and/or *Beijing's* anchor(s) struck and/or became entangled with the Pipeline, causing structural damage and/or displacement.

69.     The *MSC Danit*'s and/or *Beijing's* anchor and/or anchor chain strike(s) severely weakened and/or cracked the concrete casing protecting the Pipeline. The suspected location of the Pipeline rupture is in close proximity to the *MSC Danit*'s and/or *Beijng's* anchor strike(s).

70.     Furthermore, the growth of marine life around the displaced section of the Pipeline further suggests that the concrete casing protecting the Pipeline suffered damage *months prior* to the oil spill—*i.e.*, at or about the time that the *MSC Danit* and/or *Beijing's* anchor(s) struck the Pipeline.[35] The *MSC Danit*'s and/or *Beijing's* anchor and/or anchor chain weakened the Pipeline's integrity to a degree that permitted rupture and breach on or about October 2, 2021.

71.     Moreover, despite a duty to report hazardous conditions, the Shipping Defendants failed to report their anchor-dragging incidents to authorities despite dragging anchor while crossing over the Pipeline repeatedly.

**F.     Amplify Failed To Adequately Monitor Its Pipeline**

72.     It is apparent that the Amplify Defendants had no ability to identify this significant displacement of, and damage to, the Pipeline, and/or recklessly failed to monitor, respond to, or notify the appropriate authorities of the event. The force needed to move the 4,000-foot section of Pipeline is significant, begging the question of how such an event could occur without triggering a single sensor—pressure, flow, or otherwise—or notifying the Elly or Beta Pump Station control centers.

---

[35] *See* Richard Winton, *Coast Guard targets second vessel tied to Orange County oil spill*, LOS ANGELES TIMES (Nov. 19, 2021, 3:59 p.m.), https://www.latimes.com/california/story/2021-11-19/coast-guard-ties-second-vessel-to-pipe-dragging-connect-to-orange-county-oil-spill.

73.     Putting aside technology, the Amplify Defendants' manual or human detection of irregularities in the Pipeline was nonexistent. Amplify Defendants claim that they monitored the Pipeline weekly by boat[36] and also cleaned the Pipeline weekly.[37] Given that the resting point of a 4,000-foot section of the Pipeline had shifted 105 feet months earlier (*see supra* Image 8), as found by investigators,[38] Amplify Defendants were negligent and/or reckless in failing to identify and rectify the precursor to the oil spill crisis.

74.     Furthermore, Pipeline operators are required to make an annual report to the Pipeline and Hazardous Materials Safety Administration indicating whether any changes, including geospatial attributes have been made to the Pipeline. The State of California adds additional requirements, through the California State Pipeline Mapping System Operator Submission Standards. The State Pipeline Mapping System, among other things, requires operators to document any change of greater than 100 feet to the position of a Pipeline.[39]

75.     On April 26, 2021, a little over three months after the Pipeline had been struck and moved more than 100 feet by the Shipping Defendants, Rick Armstrong, Amplify's Pipeline Superintendent, sent a letter to the California State Fire Marshall, stating that there had been "no changes to date" to the mapping location of its associated pipelines. On information and belief, this statement that the Pipeline's location had not changed was untrue and could not have been based

---

[36] Reuters, Hours to Stop Leak, fn. 11.

[37] CNN Newsource, *A timeline of the California oil spill, from the first report to the clean-up*, KTZV (Oct. 10, 2021, 12:27 p.m.), https://ktvz.com/news/2021/10/10/a-timeline-of-the-california-oil-spill-from-the-first-report-to-the-clean-up/.

[38] NPR, *Oil pipeline damage may have happened months before the massive oil spill* (Oct. 8, 2021, 5:10 p.m.), https://www.npr.org/2021/10/08/1044644445/oil-pipeline-damage-may-have-happened-months-before-the-massive-oil-spill.

[39] California Resources Agency, State Fire Marshall, *California State Fire Marshal Pipeline Mapping System Operator Submission Standards*, https://osfm.fire.ca.gov/media/10023/spms_standards-2016_ada_update2019.pdf (last visited Mar. 21, 2022).

on an inspection of the Pipeline. Amplify's failure to inspect the Pipeline meant that State and Federal mapping of the Pipeline would be inaccurate.

76.     Worse, as discussed herein, the Amplify Defendants knew or reasonably should have known of the high potential for anchor strikes to and/or entanglement with the Pipeline. This was especially true of the unburied section, particularly given the significant increase of vessel traffic in the San Pedro Bay.

77.     Compounding these issues, the Amplify Defendants overworked their employees and experienced high turnover as a result, with at least one employee warning, "Amplify Energy is a company that focuses on the rich getting richer. The executives are only concerned with the advancement of themselves as well as hiring their friends and personal acquaintances for top heavy positions for which they do not qualify. The employees who have been with the company for years are never considered for advancement and are held in their current capacities. The pay at Amplify is competitive with the market; however, you are expected to do a number of different jobs for one salary due to their high turnover."[40] As would be revealed later, investigators discovered that the Pipeline "was understaffed and the crew was fatigued and insufficiently trained in the leak detection system."[41]

**G.     The Amplify Defendants' Responsibilities Under Their Oil Spill Prevention Response Plan**

78.     Amplify's 2012 Oil Spill Prevention and Response Plan, or OSPRP, begins with a very direct warning of the danger their activities pose: "A worst-case crude oil release from the DOT-regulated San Pedro Bay Pipeline could potentially

---

[40] *See* Indeed, Amplify Energy Reviews: Working at Amplify Energy, https://www.indeed.com/cmp/Amplify-Energy/reviews (last visited Jan. 25, 2022).
[41] Brian Melley, *A Houston-based oil company was indicted over a crude spill in Southern California*, ASSOCIATED PRESS (Dec. 15, 2021, 9:42 p.m.) https://www.businessinsider.com/houston-based-oil-company-indicted-southern-california-oil-spill-2021-12.

cause significant and substantial harm to the environment, as defined in the Oil
Production Act of 1990 . . . ."[42] It further makes the point that:

> These response guidelines are not intended to supplant
> the use of common sense or actions not specifically
> mentioned in this plan, but necessary to mitigate a
> problem. Depending on the incident, each response may
> require different or modified approaches or sequences of
> events to reach the primary objective of the [Defendants];
> that is, to ensure the safety of life, protection of the
> environment, and protection of property.[43]

79.    The OSPRP specifically identifies the potential victims of a crude oil
release, noting: (1) "[n]early population center[s]"; (2) "[p]roperties at risk
(marines, beaches, harbors, parks)"; (3) "[e]conomic and cultural resources";
(4) "[b]iological resources (*e.g.*, sensitive habitats, commercial and recreational
fish/shellfish stocks, wildlife, plant life)"; and (5) "[o]ther marine dependent
uses."[44] To prevent the potentially devastating impacts to these victims of an oil
spill, a "[n]o response option (*i.e.*, mechanical or non-mechanical) should be ruled
out in advance."[45] The importance of immediate detection of an oil spill and an
effective response is compounded by the fact that spills originating from the oil
system "can present challenges to response and recovery efforts due to obstacles
and proximity to bodies of water."[46] Regardless of the scenario, one directive holds
true: "**In General – For Spill Response – Do Not Delay. Plan Ahead. Over-
respond and stand down if necessary. Do not get behind the curve.**"[47]
(Emphasis in original.)

80.    In 2020 and beyond, Amplify utilized a custom leak detection system
to identify any release of crude oil from the Pipeline. In 2020 and beyond, Amplify

---

[42] 2012 OSPRP, fn. 12.
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*

utilized a custom leak detection system to identify any release of crude oil from the Pipeline—this alarm purportedly would trigger if there was a one-percent change in flow rate. For example, based upon an observed flow rate of roughly 10,500 gallons (250 barrels) per hour, a one percent change in the nominal flow rate over fifty minutes would trigger the leak detection alarm. Converted from flow rate per hour to flow rate per fifty minutes (10,500 gallons divided by sixty minutes, then multiplied by fifty minutes), the baseline flow rate is 8,750 gallons per fifty minutes. Thus, if 87.5 gallons (one percent of 8,750 gallons) of oil were leaked over fifty minutes at the baseline flow rate (8,750 gallons), the leak detection alarm would sound.

81.    Any anomaly detected by the automated leak detection is directly reported to the control rooms at Elly and Beta Pump Station, which are manned 24 hours per day. Each person in those control rooms must be able to "recognize the alarms generated and respond to each alarm."[48] Should an alarm be triggered, "control room operators have the ability" to automatically shut down the "shipping pumps" by use of a "shutdown valve."[49] Such critical responsibilities must entail training, and the Amplify Defendants "emphasize that, in the event a leak is detected, it is essential to close the platform and onshore shut-in valves as quickly as possible after shutting down shipping pumps to minimize the volume of oil released from the line."[50] During an emergency shutdown, the shipping pumps can be stopped and the Pipeline valve "closed within one minute."[51] If the leak detection system becomes inoperative, for any reason, routine surveillance of the Pipeline shall be conducted until the system is repaired.

82.    It is now known that Amplify's failure to comply with its responsibilities under the OSPRP caused the release of at least 25,000 gallons of

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*

crude oil into and on the Orange County coastal region. If Amplify continued to pump crude oil through the Pipeline for a total of seven hours after the leak began, which appears to be the case, that would amount to an average of 3,570 gallons released per hour. That number represents an approximate fifty percent change in the nominal flow of oil through the Pipeline over fifty minutes. This would be consistent with the eight different leak-detection alarms that sounded on October 1 and October 2, 2021.

## H.    The Amplify Defendants Have a Long History of Safety Violations

83.    The Amplify Defendants are not strangers to causing oil spills and negligently operating the Beta Unit Complex.

84.    The Bureau of Safety and Environmental Enforcement ("BSEE"), a federal agency that oversees the offshore drilling industry, has documented 125 instances of non-compliance; 53 of these instances were warnings, 71 were component shut-in violations, and one was a facility shut-in violation.

85.    A "component shut in" violation pertains to a particular piece of equipment or location that is not in accordance with standing regulations and must be shut down until the violation is corrected.[52] This type of violation occurs when the non-compliance is part of "an unsafe situation or it poses an immediate danger to personnel or other equipment . . . ."[53] A "facility shut in" violation arises where "the unsafe situation poses an immediate danger to the entire facility or personnel and the specific equipment or location cannot be shut in without affecting the overall safety of the facility."[54] Importantly, a "warning" does not suggest a minor violation; rather, a warning will "normally be issued" in an "after-the-fact situation where no correction is possible" and a "shut in would serve no useful purpose."[55]

---

[52] Off. of Offshore Regulatory Programs, Offshore Safety Improvement Branch, Nat. Office Potential Incident of Noncompliance (PINC) List (Sept. 2016), https://www.bsee.gov/sites/bsee.gov/files/office-pincs-final-92016.pdf.
[53] Id.
[54] Id.
[55] Id.

86.     Beta Offshore received its last pre-spill violation on September 29, 2021, just days before the oil spill.[56]

87.     The current oil spill crisis is not the Beta Unit Complex's first oil spill, nor was it the first time its alarms apparently failed. In fact, in 1999, one of the crude oil lines connecting Platform Eureka to Platform Elly was "shut in" due to "leakage," according to the Defendants' OSPRP.[57] Thereafter, an investigation determined that an electronic monitoring system that was supposed to detect leaks did not sound an alarm.[58] This leak caused Platform Eureka to be shut down for nine years. In the same year, 2,000 gallons of crude oil were spilled from the Beta Unit Complex into the Pacific Ocean, resulting in a $48,000 fine for the operators, although it is unclear whether that spill was connected to the Platform Eureka shutdown.[59] More recently, the Amplify Defendants were fined $85,000 in 2013 and 2014 for three separate incidents, one of which resulted in the release of oil into the Pacific Ocean.[60]

88.     The Beta Unit complex was built in 1980 and was anticipated to operate for approximately 35 years, after which the platform was to be removed and wells were to be sealed. The complex is now more than five years beyond its expected life span which puts the facility at increased risk for failure. Indeed, the

---

[56] Casey Tolan, *Operator of leaking oil infrastructure has record of violations*, CNN (Oct. 4, 2021, 3:14 P.M.), https://www.cnn.com/2021/10/04/us/beta-operating-company-violations/index.html.

[57] 2012 OSPRP.

[58] Deborah Schoch, *Seven Leaks Discovered in Shut-Off Pipeline*, LA TIMES (June 20, 1999, 12:00 a.m.) https://www.latimes.com/archives/la-xpm-1999-jun-10-me-46179-story.html.

[59] CALIFORNIA NEWS TIMES, *OC oil spill: oil rig operator waited 3 hours to shut off damaged pipeline report says* (Oct. 6, 2021), https://californianewstimes.com/oc-oil-spill-oil-rig-operators-waited-3-hours-to-shut-off-damaged-pipeline-report-says/549529/.

[60] Casey Tolan, *Operator of leaking oil infrastructure has record of violations*, CNN (Oct. 4, 2021, 12:14 p.m.), https://www.cnn.com/2021/10/04/us/beta-operating-company-violations/index.html.

risk of a spill more than doubles as a pipeline ages from 20 to 40 years.[61] Following the 1999 oil spill discussed above, an investigation found seven small leaks in no apparent pattern along 3,500 feet of line, and determined that an electronic monitoring system that was supposed to detect leaks did not sound an alarm.[62] The seven leaks were the most ever found at a single drilling platform in federal waters, which raised concerns as to whether there was corrosion affecting the integrity of the Pipeline.[63] Corrosion is a chief concern for pipeline failure.[64]

**I.**     **The Obvious Warnings of the Unfolding Oil Spill Crisis**

89.     On Friday October 1, 2021, at 4:10 p.m., the Pipeline's automated leak-detection alarm notified the Beta Unit Complex control rooms of an anomaly in the Pipeline. There was plenty of light outside, which provided the Amplify Defendants' agents and employees ("Pipeline Personnel") every opportunity to inspect the Pipeline for the release of crude oil. They did not. To the contrary, no action was taken until 5:10 p.m. when Pipeline Personnel shutdown and then restarted the Pipeline. Despite favorable lighting conditions, Pipeline Personnel did not attempt to visually locate a potential release of oil from the Pipeline at this time. Leak-detection alarms continued to sound through the evening and into the early morning of Saturday, October 2, 2021, including at 5:52 p.m., 7:15 p.m., 8:39 p.m., 9:23 p.m., 10:01 p.m., 11:30 p.m., and 5:28 a.m. the following morning.

---

[61] California State Lands Commission & Bureau of Land Management, Draft Environmental Impact Report/ Environmental Impact Statement for the Celeron/All American and Getty Pipeline Projects (Aug. 1984) at 4-166, *available at* https://ia902905.us.archive.org/10/items/draftenvironment09envi/draftenvironment09envi.pdf.

[62] Deborah Schoch, *Seven Leaks Discovered in Shut-Off Pipeline*, LA TIMES (June 20, 1999, 12:00 a.m.) https://www.latimes.com/archives/la-xpm-1999-jun-10-me-46179-story.html.

[63] *Id.*

[64] *See* Lena V. Groeger, *Pipelines Explained: How Safe are America's 2.5 Million Miles of Pipelines*, PROPUBLICA (Nov. 15, 2012, 11:27 a.m.) https://www.propublica.org/article/pipelines-explained-how-safe-are-americas-2.5-million-miles-of-pipelines.

90.     According to 10 former and current employees of the Amplify Defendants and their internal spill response plan, each alarm should have triggered rapid phone calls to managers, regulators, and the U.S. Coast Guard, and swiftly set in motion steps to shut down the Pipeline and the platforms that feed it.[65] The Amplify Defendants' OSPRP emphasizes the critical need for communication upon the occurrence of an extraordinary event, providing that "[e]ffective and efficient communication systems are a central requirement for emergency response at *every level*."[66] (Emphasis added.) Instead, the Amplify Defendants continued to pump oil through the Pipeline unabated for hours after each alarm.

91.     From 5:10 p.m. until approximately 10:33 p.m. on October 1, 2021, Pipeline Personnel shut down and restarted the Pipeline five (5) times, pumping crude oil through the Pipeline for an aggregate of three hours. From approximately 11:15 p.m. on October 1, 2021, until 2:27 a.m. on October 2, 2021, Pipeline Personnel conducted a manual leak detection test. Pipeline Personnel still had not attempted to perform a visual inspection of the Pipeline to attempt to identify a potential release of crude oil.

92.     Undeterred, Pipeline Personnel restarted the Pipeline at approximately 5:11 a.m. on October 2, 2021, causing crude oil to flow through the Pipeline, again. This decision was based upon Pipeline Personnel's understanding that non-Amplify personnel in a boat were unable to locate an oil discharge from the Pipeline in darkness of the night.

93.     The Pipeline Personnel's actions, inactions, and omissions were highly reckless. As the Amplify Defendants' agents, employees, and/or servants were acting within the scope of their duties, the Amplify Defendants are equally

---

[65] Jessica Resnick-ault and Nichola Groom, *Despite preparation, California pipeline operator may have taken hours to stop leak*, REUTERS (Oct. 8, 2021, 2:46 p.m.), https://www.reuters.com/business/energy/despite-preparation-california-pipeline-operator-may-have-taken-hours-to-stop-leak-2021-10-08/.
[66] 2012 OSPRP.

responsible for the reckless conduct. Further, the Amplify Defendants failed to provide sufficient training to Pipeline Personnel regarding the Pipeline's automated leak-detection system. Even worse, the Amplify Defendants allowed for and maintained understaffed and fatigued Pipeline Personnel to operate the Pipeline on and about October 1 through October 2, 2021.

94.     The Amplify Defendants' grossly reckless actions and inactions leading to the rupture are further illustrated by the fact that the Pipeline's automated leak-detection system was allegedly broken. According to Amplify, the system "repeatedly and wrongly signaled a potential leak at the platform where no leak was actually occurring."[67] In other words, the Amplify Defendants were virtually incapable of preventing an imminent crisis. The Amplify Defendants failed in nearly every possible way to take steps to protect the Orange County coast from exposure to toxic crude oil.

**J.     The Rupture**

95.     On the evening of Friday October 1, 2021, at around 6:30 p.m., Orange County residents began emailing each other asking if their neighbors smelled toxic oil.[68] Residents also reported an oil sheen on the water to the Coast Guard.[69] At the same time, a commercial vessel anchored in the San Pedro Bay noticed" a "sheen" of oil on the water, which it later reported to the Coast Guard. By 7:00 p.m., satellite imagery strongly suggested a spill. At around 7:30 p.m., the Newport Police Department informed residents ***not*** to call 911 for a gas smell throughout the

---

[67] Robert Burnson, *Amplify Energy Charged Over California's Worst Oil Spill in Nearly 30 Years*, BLOOMBERG GREEN (Dec. 15, 2021, 6:04 p.m.), https://www.bloomberg.com/news/articles/2021-12-16/amplify-energy-charged-with-negligence-in-san-diego-oil-spill.

[68] ASSOC. PRESS, *Pipeline owner suspected in Orange County oil spill had been cited for violations 72 times*, KTLA5 (Oct. 4, 2021, 8:43 P.M.), https://ktla.com/news/local-news/oil-platform-owner-in-orange-county-spill-previously-faced-bankruptcy-history-of-regulatory-problems/.

[69] ASSOC. PRESS, *OC oil spill: Underwater pipeline was split open, moved more than 100 feet, officials say*, ABC 7 (Oct. 5, 2021, 10:13 A.M.), https://abc7.com/oc-oil-spill-pipeline-was-split-open-and-displaced-officials-say/11085759/.

city, because the calls were overwhelming the switchboard. Similar reports were being made to adjacent police departments as well. Satellite imagery confirmed an oil slick forming around 10:58 p.m. that night.[70] Yet the Amplify Defendants did not reach out to a single government agency or environmental agency during this entire time.

96. By 2:00 a.m. Saturday, October 2, 2021, NOAA reported or received confirmation of a likely spill. No fewer than six (6) leak-detection alarms had been triggered at the Beta Unit Complex by this time.

97. In the aftermath of the rupture, Amplify's CEO claimed that the company shut down the Pipeline at 6 a.m. on Saturday, October 2, 2021, over *14 hours* after the first leak-detection alarm sounded and over *12 hours* after residents, miles away, smelled oil. The Amplify Defendants have not confirmed when they closed valves in the Pipeline, which would have prevented any oil left in the Pipeline from spilling out into the ocean. *Two hours later*, at 8 a.m., Amplify allegedly determined what was already obvious to residents, anchored vessels, fishers, and NOAA—that there was an oil spill. Amplify then waited *another hour* before reporting the spill to the National Response Center.[71] In other words, the Amplify Defendants did not notify a single government agency of the crisis for nearly *sixteen hours* after the spill.

98. It is now known that the Pipeline had a thirteen-inch crack from which oil was released, and that over 4,000 feet of the Pipeline was not where it was supposed to be. As Orange County Supervisor Katrina Foley demanded to know on

---

[70] Robert Tuttle and John Gittelsohn, *Global Supply Chain Nightmare May Be Behind California Oil Spill*, BLOOMBERG (Oct. 7, 2021, 9:05 A.M.), https://www.bloomberg.com/news/articles/2021-10-06/california-oil-spill-cause-may-have-been-ship-anchor-crowded-port.

[71] Carolina Lumetta, *Investigation finds oil pipeline leaked for hours*, WORLD DIGITAL (Oct. 6, 2021), https://wng.org/sift/investigation-finds-delays-in-calif-oil-spill-response-1633560518.

Saturday, October 9, 2021, "Why didn't the oil company know their [P]ipeline was damaged? Why didn't they fix it or at least turn off the valve?"[72]

**K.**     **The Catastrophic Consequences of the Amplify Defendants' Failure to Detect And Stop Their Spill**

99.     Because the Amplify Defendants did not shut down the Pipeline, reduce the flow of oil, or close crucial valves for hours, the spill grew to disastrous proportions. This unconscionable delay appears to have been fed in part by attempts at internal damage control.[73]

100.     The disastrous impact of the oil spill was apparent immediately. On the morning of Saturday, October 2, 2021, fishing boats and yacht charters experienced the ongoing spill firsthand. Surrounded by oil, they were forced to



**Image 11.** Environmental Impact (1)

[72] Supervisor Katrina Foley, Oct. 9, 2021 Tweet, https://twitter.com/SupervisorFoley/status/1447015401922052097?s=20.
[73] Anita Chabria, et al., *Pipeline company evades questions over a 15-hour gap before reporting oil spill*, LOS ANGELES TIMES (Oct. 9, 2021, 5:00 a.m.), https://www.latimes.com/california/story/2021-10-09/oil-spill-timeline-questions-contradictions.

FIRST AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
CASE NO.: 8:21-CV-1628-DOC(JDEX)

return to local marinas because their hulls were covered in toxic sludge.[74] The oil spill created a slick that stretched for dozens of miles. Within the first days, oil from the spill washed up on Huntington Beach and the Talbert March wetlands. The below photos are but a few examples of the damage to these precious habitats:[75]

---

[74] ASSOC. PRESS, *Pipeline owner suspected in Orange County oil spill had been cited for violations 72 times*, KTLA5 (Oct. 4, 2021, 8:43 P.M.), https://ktla.com/news/local-news/oil-platform-owner-in-orange-county-spill-previously-faced-bankruptcy-history-of-regulatory-problems/.

[75] US Coast Guard via Reuters, *U.S. Coast Guard probes whether ship struck California oil pipeline,* REUTERS (Oct. 7, 2021, 1:48 p.m.), https://www.reuters.com/news/picture/us-coast-guard-probes-whether-ship-struc-idUSRTXI885B.

1
2
3
4
5
6
7
8
9
10
11

**Image 12.** Environmental Impact (2)

12      101.   In the immediate aftermath of the spill, dolphins were seen swimming

13   through the toxic oil, dead fish washed up onto beaches, and residents were

14   encouraged not to approach "oiled wildlife."[76] (*See* Image 13.)



**Image 13.** Environmental Impact (3)

15
16
17
18
19
20
21
22
23
24
25
26
27
28

[76] *Id.*

102.    As the toxic oil slick spread via ocean currents, it left dead marine animals in its wake. While the total number of animals affected by the spill is unknown, the UC Davis Oiled Wildlife Care network reported recovering 82 dead birds, and six dead marine mammals, three of which were sea lions. These numbers do not reflect the full impact that the spill had on wildlife. Birds may be the most visible victims of oil spills because of how quickly they are impacted by oil. (*See* Image 14.) Oiling of birds eliminates the insulative air layer beneath their feathers, leading to hypothermia, loss of buoyancy and a reduced flight capability. Affected birds can die in a matter of days. In addition, they can become victims of predation, causing secondary contamination in these predators. Significant internal effects to birds can arise from preening of contaminated feathers.



**Image 14.** Environmental Impact (4)

103.    Much of the damage to wildlife is out of sight but may continue for years. Many fish and invertebrates start their lives as larvae, including lobsters.[77]

---

[77] Dan Cabot, *Life Cycle of a lobster*, MV TIMES (Jul. 8, 2010), https://www.mvtimes.com/2010/07/08/life-cycle-lobster-1446/.

Larvae are highly vulnerable to the effects of oil. Accordingly, their populations can be expected to fall post-spill.[78]

104.   Crude oil can also kill a vast amount of phytoplankton. Phytoplankton feeds countless smaller creatures that are microscopic but are the base of the food chain. Spills also damage plants, which have similar ramifications for the broader ecosystem.[79]

105.   Additionally, the spill affected the health, migrations, and movements of whales, dolphins, and sea turtles, negatively impacting the local sea life watching industry. Marine mammals like whales and dolphins have to surface to breathe, and if they come up for air through an oil slick, they can suck the toxic substance into their lungs. When they surface in an area nearby an oil spill, they—like humans—can inhale the toxic chemicals evaporating from the surface of the oil. Additionally, oil spills can kill or contaminate smaller animals, such as krill, which are eaten by whales and the fish that dolphins eat.[80] Notably, the presence of whales was very high at the time of the spill.

106.   Sea turtles, including Green Turtles, Loggerheads, Olive Ridley, and Leatherback, inhabit the waters of Southern California. It is here that they feed and grow, foraging on invertebrates, seaweed, and sea grasses from the San Diego Bay up to the San Gabriel River in Long Beach. They forage in the open water by day and move into protected bays, lagoons, and estuaries at night. The spill has polluted their food supply and the coastal areas where they rest. Additionally, because of the

---

[78] Benji Jones, *Why the Huntington Beach oil spill is so harmful to wildlife*, VOX (Oct. 6, 2021, 9:00 A.M.), https://www.vox.com/down-to-earth/22708654/oil-spills-wildlife-huntington-beach-california.
[79] *Id.*
[80] WDC, *Ocean Pollution*, https://us.whales.org/our-4-goals/create-healthy-seas/ocean-pollution/ (last visited Jan. 25, 2022).

spill, booms and other protective equipment prevented these species from moving, trapping them in oiled waters and disrupting their feeding and resting patterns.[81]

107.   There is also the fact that many animals exposed to the toxic crude oil will never recover, despite efforts to help. Studies suggest that wildlife-assistance efforts during oils spills may merely prolong the inevitable loss of populations of certain species within the oiled areas.[82] Then there is the tragic reality that it is impossible to fully "cleanup" the areas impacted by an oil spill.[83]

108.   As a result of the spill, authorities were also forced to close the entrances to Newport Harbor and Dana Point Harbor to vessel traffic.[84] The emergency action was taken to help prevent more oil from entering the harbors. Accordingly, all boats were prevented from entering or exiting the harbors.[85] Residents and tourists were consequently unable to enjoy the use of the harbor for pleasure boating, sport fishing, and other activities such as whale watching.

109.   The spill's impacts extend beyond industries that rely on a healthy aquatic ecosystem. On October 3, 2021, the OC Health Care Agency issued a health

---

[81] Sports Fishing Assoc. of Cal., *Southern California Sea Turtles*, https://www.californiasportfishing.org/single-post/2016/06/30/southern-california-sea-turtles (last visited Oct. 7, 2021).

[82] Andrew Nikiforuk and Hakai Magazine, *Why We Pretend to Clean Up Oil Spills*, SMITHSONIAN MAGAZINE (July 12, 2016), https://www.smithsonianmag.com/science-nature/oil-spill-cleanup-illusion-180959783/.

[83] Denise Chow, *How we clean oil spills hasn't changed in decades. These scientists want to change that.*, NBC NEWS (Oct. 6, 2021, 3:31 p.m.), https://www.nbcnews.com/science/environment/clean-oil-spills-hasnt-changed-decades-scientists-want-change-rcna2649.

[84] CBSLA Staff, *Enormous Huntington Beach Oil Spill Closes Dana Point Harbor Indefinitely*, CBS LOS ANGELES (Oct. 5, 2021, 10:31 A.M.), https://losangeles.cbslocal.com/2021/10/05/enormous-huntington-beach-oil-spill-closes-dana-point-harbor-indefinitely/.

[85] Newport Indy Staff, *Entrance to Newport Harbor Temporarily Closed Due to Oil Spill*, NEWPORT BEACH INDEPENDENT (Oct. 4, 2021), https://www.newportbeachindy.com/entrance-to-newport-harbor-temporarily-closed-due-to-oil-spill/; Sonya Quick, *Dana Point Harbor is Latest Closure Along OC's Coast in Efforts to Prevent Exposure to and Spread of Crude Oil*, VOICE OF OC (Oct. 5, 2021), https://voiceofoc.org/2021/10/dana-point-harbor-is-latest-closure-along-ocs-coast-in-efforts-to-prevent-exposure-and-spread-of-crude-oil/.

advisory for residents exposed to oil contaminants, warning that the "effects of oil spills on humans may be direct and indirect," and requested that residents "refrain from participating in recreational activities on the coastline such as swimming, surfing, biking, walking, exercising, gathering, etc."[86] The Agency advised that spilled oil, which can contain toxic chemicals, poses health threats via skin contact or inhalation. Symptoms of "excessive exposure to oil or dispersants commonly include the following: skin, eye, nose and throat irritation; headache; dizziness; upset stomach; vomiting; cough or shortness of breath."[87]

### 1.    The Spill's Impact on Commercial Fishing

110.   As a result of the spill and Defendants' failure to contain it, the CDFW was forced to close previously lucrative offshore fisheries due to the public health threat caused by the oil spill into marine waters. According to California's Office of Environmental Health Hazard Assessment ("OEHHA"), fish in oil spills can be dangerous to eat because they can ingest oil that can contain polycyclic aromatic hydrocarbons that can cause cancer if eaten in certain amounts.[88]

111.   On October 3, 2021, the taking of all fish and shellfish was prohibited from Huntington Beach to Dana Point including the shorelines and offshore areas, and all bays, as set forth in map below (Image 17):

---

[86] Press Release, OC Health Care Agency Issues Health Advisory For Residents Exposed To Oil Contaminants, OC Health Care Agency (Oct. 3, 2021), https://mailchi.mp/ochca/hca-health-advisory-re-oil-spill-10114934.

[87] *Id.*

[88] Alyse Messmer, *California Fisherman Can't Access Nearly 12 Miles of Water 1 Month After Oil Leak*, NEWSWEEK (October 29, 2021, 10:21 a.m.), https://www.newsweek.com/california-fishermen-cant-access-nearly-12-miles-water-1-month-after-oil-leak-1644001.



**Image 17.** Fishery Closures, 10-3-21

112.   As the days passed, the true size and scope of the area impacted by the spill continued to grow. On October 5, 2021, the OEHHA expanded the geographic area of the fishery closures to include San Clemente and extended the offshore area to coastal points eight miles offshore, and both Newport Harbor and Dana Point harbor were closed to vessel traffic.[89]

113.   On October 7, 2021, the geographic boundaries of the existing fishing and shellfish harvesting closure area was again expanded to stretch from the west jetty of Anaheim Bay to near the southern border of the San Onofre power plant.[90] (*See* Image 18.)

---

[89] Cal. Dept. of Fish and Wildlife, Amended Declaration of Fisheries Closure (Oct. 5, 2021) https://socalspillresponse-com-jtti.s3.us-west-2.amazonaws.com/wp-content/uploads/2021/10/05115854/CDFW-Fisheries-Closure-Declaration-Amendment_10-05-21.pdf.

[90] Cal. Dept. of Fish and Wildlife, Amended Declaration of Fisheries Closure (Oct. 7, 2021), https://socalspillresponse-com-jtti.s3.us-west-2.amazonaws.com/wp-content/uploads/2021/10/07174741/CDFW-Declaration-Amendment_2_10.07.21.pdf.



**Image 18.** Fishery Closures, 10-7-21

114.    Eleven formerly lucrative fishing blocks were closed in whole or in part as a result of the spill. The closure then included approximately 650 square miles of marine waters and approximately *45 miles* of shoreline.[91] The closure area encompassed all bays and harbors from Seal Beach to San Onofre State Beach. The map below illustrates the extent of the fisheries closure.[92]

115.    While the fisheries were closed, CDFW sampled seafood in the closed area to measure and evaluate the levels of chemicals found in oil, polyaromatic hydrocarbons (PAHs), which can accumulate in species caught for human consumption, causing an increased risk of cancer and other adverse health conditions. It was not until November 29, 2021, that the OEHHA determined that there was no further risk to public health from seafood harvested in the affected

---

[91] *Id.*
[92] *Id.*

area, and ordered the fisheries closure lifted.[93] By the time the closure was lifted, a wide swath of Southern California's fisheries had been closed to both commercial and recreational fishing for nearly two months.

116.  The harbor and fisheries closures had a significant impact on fishing. Dana Point Harbor and Newport Harbor were completely closed until October 9, 2021, and fishing boats were prohibited from moving at all during that time.[94] After the harbors were re-opened, fishing was prohibited for miles. Although Fishers were able to fish outside of the confines of the closed fisheries, demand for fish was drastically reduced because of concerns about contamination. During the first weeks of October, which is usually a big season for fishing because it is spawning season, commercial fishers saw demand drop 90% due to the spill.[95]

117.  Certain types of fishing were even harder hit: Fishers were unable to harvest lobsters during one third of the annual season for California spiny lobsters which runs from October to March.[96]

118.  The closures also had a negative effect on the sale of fish caught outside of the closed areas. As late as November 2021, the Orange County Health Care Agency Director's public advisory recommended the public to refrain from consuming contaminated seafood from the "affected beaches," rather than just the closed zones.[97] This warning may have led to customers assuming that all locally

---

[93] Cal. Dept. of Fish and Wildlife, Southern California Fisheries Closure Lifted, (November 29, 2021), https://wildlife.ca.gov/News/southern-california-fisheries-closure-lifted.

[94] Jordan B. Darling, *Oil Spill Off of Southern California Coast Prompts Harbor and Fisheries Closures*, THE LOG (October 14, 2021) https://www.thelog.com/news-departments/oil-spill-off-of-southern-california-coast-prompts-harbor-closures/.

[95] HHRG-117-1115 Written Testimony of Scott Breneman, Joint Field Hearing October 18, 2021.

[96] Stefan A. Slater, *How Did the OC Oil Spill Impact Local Seafood?*, LAIST (Dec. 15, 2021, 8:00 a.m.), https://laist.com/news/food/orange-county-oil-spill-impact-local-seafood-2021.

[97] Orange County, *County Health Officer on Local Oil Spill- Health Advisory #4*, https://www.ocgov.com/news/county-health-officer-local-oil-spill-health-advisory-4 (Oct. 14, 2021).

caught fish was contaminated or that there were no fish available.[98][99] Wholesalers and other restaurant customers were not interested in "local" product. Local fishers lost tens of thousands of dollars in revenues.[100] Fish market owners saw an immediate decline in business, because customers were afraid that fish were contaminated. All markets in the area that supply or benefit from the Orange County fishing-related activities suffered as well.

## 2.   The Spill's Impact on Residents

119.   In the immediate aftermath of the spill, in Huntington Beach, California, known as "Surf City USA," the entire shoreline was closed between the Santa Ana River Jetty and Seaport Street. In Newport Beach, famous for its stunning beaches, all city beaches were closed due to the oil spill.  All city and county beaches in Laguna Beach, including Aliso Beach, Laguna Royale, Table Rock Beach, Thousand Steps Beach, and West Street Beach were closed. The maps below (Images 15-16) demonstrate the many miles of formerly pristine coastal

---

[98] *Id.*, and Fisherman and Foodways Begin to Feel the Squeeze of Orange County Oil Spill, October 6, 2021,https://www.latimes.com/food/story/2021-10-06/fishermen-and-foodways-begin-to-feel-the-squeeze-of-orange-countys-oil-spill. https://apnews.com/article/oil-spills-science-business-pacific-ocean-california-2dd5c29a767b3033469dc0f1a3c8706d

[99] *Id.*; Stephanie Breijo, *Fisherman and foodways begin to feel the squeeze of Orange County oil spill*, LOS ANGELES TIMES (October 6, 2021, 1:34 p.m.), https://www.latimes.com/food/story/2021-10-06/fishermen-and-foodways-begin-to-feel-the-squeeze-of-orange-countys-oil-spill. https://apnews.com/article/oil-spills-science-business-pacific-ocean-california-2dd5c29a767b3033469dc0f1a3c8706d.

[100]Statement of Chairwoman Katie Porter, Oversight and Investigations and Energy and Mineral Resources, "Southern California Oil Leak: Investigating the Immediate Effects on Communities, Business and the Environment" October 18, 2021

beaches that were initially closed because of the spill, along with water advisories
extending up from Seaport Street all the way north to Seal Beach.[101]



**Image 15.** Beach Closures (1)



**Image 16.** Beach Closures (2)

---

[101] Tess Sheets, *Planning a Southern California beach trip? These beaches are
closed by the oil spill*, East Bay Times (Oct. 5, 2021, 7:35 A.M.),
https://www.eastbaytimes.com/2021/10/05/heres-what-beaches-are-off-limits-as-
officials-work-to-contain-massive-oil-spill/.

120.   As the oil slick made its way down the coast, more beaches were impacted and beaches as far south as Dana Point were closed on Tuesday morning, October 3, 2021—adding to the closures of Huntington Beach, Newport Beach, and Laguna Beach. By then, over *23 miles* of shoreline were restricted to protect the public from toxic exposure to crude oil.[102] By Friday October 8, 2021, tar balls were reported to be washing up even further south along the San Diego coastline, where beachgoers were warned of the toxic effects of the oil.[103]

121.   Real property owners and shoreline residential properties were on the spill's front lines. The beachfront and waterfront properties along the Southern Coast of California are highly valuable. The property owners and tenants enjoy the unspoiled sand, water and views, and direct access to swimming, fishing, surfing, kayaking, and other activities. As a result of the spill—its toxic stench, the fouling of the ocean, and oil that washed up onto beaches and properties—occupants of beachfront and waterfront real property along miles of formerly pristine beaches lost the use of key features of their properties due to beach closures and dangers associated with the spill.  On October 3, 2021, the Orange County Health Commissioner issued a health advisory recommending residents refrain from participating in any recreational activities on the coastline such as swimming, surfing, biking, walking, exercising, and gathering.[104]

122.   On October 4, 2021, Governor Gavin Newsom declared a state of emergency, finding the conditions caused by the oil spill, by reason of its

---

[103] Dakin Andone, *Pipeline crack in California oil spill may have occurred up to a year ago, investigators say*, CNN (Oct. 8, 2021), https://www.cnn.com/2021/10/08/us/california-oil-spill-friday/index.html; City News Service, *Unified command responds to oil spill in San Diego, Orange Counties*, ABC 10 News San Diego (Oct. 10, 2021), https://www.10news.com/news/local-news/san-diego-news/unified-command-responds-to-oil-spill-in-san-diego-orange-counties.

[104] Orange County, *OC Health Care Agency Issues Health Advisory for Residents Exposed to Oil Contaminants*, https://www.ocgov.com/news/oc-health-care-agency-issues-health-advisory-residents-exposed-oil-contaminants.

magnitude, to be beyond the control of local government, and sought to utilize all available resources to support the response, cleanup, and mitigation of the oil spill.[105] Governor Newsom stated the "oil release has impacted and continues to threaten the environment and marine life in the area, including marine mammals, birds, and fish," as well as "reached the Huntington Beach shoreline and threatens numerous jurisdictions along the coast, resulting in beach closures."

123.    Following intensive clean-up efforts, affected beaches and harbors slowly reopened. Orange County reopened Salt Creek Beach, Strands Beach, and Baby Beach in Dana Point on October 7, 2021.[106] Newport Beach and Dana Point Harbors were reopened for all vessel traffic on October 8, 2021.[107] On October 8, 2021, Orange County announced the reopening of the sand, but not the shoreline or the water, at beaches in Laguna Beach[108] and the reopening of Bayside Beach in Newport Beach.[109] Despite these reopenings, the City of Newport advised residents and visitors to avoid contact with the ocean water and oiled areas of the beach.[110] Huntington Beach reopened on October 11, 2021.[111] Beaches in Laguna Beach did

[105] Exec. Dept. State of Cal., *Proclamation of a State of Emergency*, (Oct. 4, 2021), https://www.gov.ca.gov/wp-content/uploads/2021/10/10.4.2021-Oil-Spill-SOE-signed.pdf.

[106] Orange County Parks, *County Beaches Dana Point Now Open following Oil Spill* https://ocparks.com/news/county-beaches-dana-point-now-open-following-oil-spill-closure#:~:text=The%20County%20of%20Orange%2C%20in,located%20within%20Dana%20Point%20Harbor.Orange County Operational Area Emergency Operations Center Press Release #5 (Oct. 7, 2021)

[107] Orange County, *Newport Beach and Dana Point Harbors Reopened Following Oil Spill Closure*, https://www.ocgov.com/news/newport-beach-and-dana-point-harbors-reopened-following-oil-spill-closure (Oct. 8, 2021).

[108] Orange County, *OC Parks Beaches in Laguna Beach Now Open Following Oil Spill Closure* https://www.ocgov.com/news/oc-parks-beaches-laguna-beach-now-open-following-oil-spill-closure (October 8, 2021).

[109] Orange County, *Newport Beach and Dana Point Harbors Reopened Following Oil Spill Closure*, https://www.ocgov.com/news/newport-beach-and-dana-point-harbors-reopened-following-oil-spill-closure (Oct. 8, 2021)

[110] *Id.*

[111] City of Huntington Beach, *CA -News-HB Beaches Re-open 10/11 at 6 am*, https://www.huntingtonbeachca.gov/files/users/residents/HB-Beaches-Reopen.pdf

not fully reopen until October 14, 2021, nearly two weeks after the spill.[112] However, the re-opening of the beaches did not mean that the beaches were safe. On October 14, 2021, Orange County issued a Health Advisory which instructed residents and visitors to exercise caution if resuming recreational activities at local beaches in order to limit the risk of contaminants being absorbed through the skin, inhalation or ingestion.[113] Even after the reopening of the beaches, officials informed the public to expect to see shoreline cleanup assessment teams and work crews equipped in protective gear monitoring, inspecting and cleaning the beaches. The equipment required to perform the monumental cleanup of the Defendants' oil spill could be seen in public parking lots along the Orange County coast for weeks thereafter.

### 3.    The Spill's Impact on Coastal Businesses

124.   The oil spill and associated closures caused major harm to shorefront and water-adjacent businesses, affecting not just the boats but also fuel docks, live-bait providers, tackle offices, fish buyers and processors, fish shippers, and restaurants.[114]

125.   Local surf shops and surf businesses note that October is a "boom" month for them because the water is warm, and the winds provide for good swells; however, much of their October was erased as a result of beach and harbor closures

_____

(Oct. 10, 2021).

[112] Orange County, *Beaches in Laguna Reopened Following Oil Spill Closure* https://www.ocgov.com/news/county-orange-beaches-laguna-beach-reopened-following-oil-spill-closure (Oct. 14, 2021).

[113] Orange County, *County Health Officer On Local Oil Spill- Health Advisory #3* https://www.ocgov.com/news/county-health-officer-local-oil-spill-health-advisory-3 (Oct. 14, 2021).

[114] Stephanie Breijo, *Fisherman and foodways begin to feel the squeeze of Orange County oil spill*, Los Angeles Times (October 6, 2021, 1:34 p.m.), https://www.latimes.com/food/story/2021-10-06/fishermen-and-foodways-begin-to-feel-the-squeeze-of-orange-countys-oil-spill. https://apnews.com/article/oil-spills-science-business-pacific-ocean-california-2dd5c29a767b3033469dc0f1a3c8706d.

and tourists' concerns about the spill which led to cancelations decimating their
historically high October profits.[115]

126.   The spill also caused the canceling of the final day of the Great Pacific
Airshow which was supposed to occur on October 3, 2021. With all three premier
North American jet demonstration teams (the U.S. Navy Blue Angels, the Canadian
Forces Snowbirds, and the U.S. Air Force Thunderbirds) performing in the same
show for the first time in 20 years, the Pacific Airshow was a cornerstone event for
Orange County. Indeed, the Pacific Airshow had assembled the largest line up of
military and civilian performers *of any airshow in U.S. history*.

127.   Huntington Beach's public safety officials confirmed that 1.5 million
people saw the show from Huntington Beach on Saturday, October 2, 2021, alone,
breaking every event attendance record in the city's history. The same number of
spectators were expected Sunday—the day the event was canceled due to the spill.

128.   State Parks spokesman Kevin Pearsall said, "Saturday was one of the
busiest days on the sand and likely in Huntington Beach's history, surpassing
Fourth of July crowds, with likely 1 million people along the shoreline [ ] viewing
the air show."[116] Pearsall further estimated that the amount of revenue lost to State
Parks and other cities will be in the millions just from closing the beach Sunday
October 3, 2021.[117]

129.   Airshow officials have stated that the event would have had a $100
million impact on the local economy. Obviously, that did not occur because of the

---

[115]*See* Laylan Connelly, *Oil spill causes problems for OC businesses that rely on
beach tourism*, THE ORANGE COUNTY REGISTER (Oct. 5, 2021, 3:47 p.m.),
https://www.ocregister.com/2021/10/05/areas-greatest-coastal-tourism-draws-
suffer-from-oil-spill/.
[116] *See* Laylan Connelly, *Major oil spill closes OC beaches, kills wildlife in
Huntington Beach*, THE ORANGE COUNTY REGISTER (Oct. 3, 2021, 9:19 a.m.),
https://www.ocregister.com/2021/10/03/major-oil-spill-forces-cancellation-of-air-
show-in-huntington-beach/.
[117] *Id.*

Airshow's cancellation.[118] In other words, the oil spill shuttered the largest spectator event in Huntington Beach's history, and thus prevented a million-plus people from gathering in Huntington Beach and neighboring cities to view the show, take advantage of local tourist attractions, dine at local restaurants, stay at local hospitality properties, and purchase goods from local vendors.

130.   It was not just the airshow. The region's hospitality industry was damaged from the oil spill. Numerous events scheduled at local hotels were cancelled, and/or had attendance slashed.[119]

131.   As the spill moved down the shore, more and more businesses were negatively impacted. A fish taco chain saw negative impacts in locations as far south as Laguna Beach and San Clemente.[120] Likewise, a chain of surf shops experienced sharp declines in business in its nine locations across the coast. Moreover, in the weeks after the spill, tourism fell, leaving hospitality properties with low occupancy. Property owners who relied upon rental income from vacation and AirBnB/Vrbo rentals, saw numerous cancellations.[121] Dolphin and whale watching businesses suffered as a majority of bookings were cancelled into November—a critical time when the presence of humpback whales off the Southern California coast was very high.

132.   Sport fishing businesses were impacted directly by the closures which prevented operators from offering tours for weeks. Thereafter, business continued

---

[118] *See* Katie Murar, *Oil Spills Into OC's Tourism Market,* ORANGE COUNTY BUS. J. (Oct. 11, 2021), https://www.ocbj.com/news/2021/oct/11/oil-spills-ocs-tourism-market/.

[119] *See* Katie Murar, *Oil Spills Into OC's Tourism Market*, Orange County Bus. J. (Oct. 11, 2021), https://www.ocbj.com/news/2021/oct/11/oil-spills-ocs-tourism-market/.

[120] Testimony of Vipe Desai, Joint Oversight Hearing October 18, 2021.

[121] *Id.*

to lag relative to prior years, as customers canceled trips because of concerns about the impact of the oil spill.[122]

133.   On December 29, 2021, nearly three months after the disaster, and following a massive clean-up effort involving 1,800 people, the Coast Guard, the CDFW, and Orange and San Diego counties announced that clean-up efforts were complete.[123] However, clean up does not equal recovery, and its end did not mean that the spill's damage has been eradicated. Indeed, "cleanup activities can *never* remove 100% of the oil spilled[,]" with a significant percentage of oil left unrecovered on average.[124] (Emphasis added.) In this case, the clean-up effort reported recovering a total of 5,544 total gallons of crude oil by vessel, which represented just twenty-two percent of the estimated total spill.[125] In other words, the Coast Guard's announcement meant only that the most obvious impacts of the spill had been addressed. Rather than a complete restoration, it signaled that the recovery effort had moved into a "transition" period characterized by continued

---

[122]  Lilly Nguyen, LA Times, *How Did the OC Oil Spill Impact Local Seafood?* https://www.latimes.com/socal/daily-pilot/news/story/2021-11-30/fishing-ban-lifted-on-o-c-coastline-two-months-after-huntington-beach-oil-spill (Nov. 30, 2021)

[123]  Hayley Smith, LA Times, *Officials Declare O.C. spill cleanup complete*, https://www.latimes.com/california/story/2021-12-29/officials-declare-o-c-oil-spill-cleanup-complete (Dec. 29, 2021); Laylan Connelly, OC Register, *Authorities announce cleanup of October's oil spill off Orange County complete*, https://www.ocregister.com/2021/12/28/authorities-announce-cleanup-of-octobers-oil-spill-off-orange-county-complete/?clearUserState=true (Dec. 29, 2021)

[124]  U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Education, *Oil Spills*, https://www.noaa.gov/education/resource-collections/ocean-coasts/oil-spills#:~:text=However%2C%20cleanup%20activities%20can%20never,damage%20than%20the%20oil%20alone (last visited Jan. 25, 2022); *see also* CBC, *How much oil is recovered in average spill? Not much, if any*, https://www.cbc.ca/news/canada/newfoundland-labrador/oil-spill-averages-hibernia-update-1.5255733 (Aug. 22, 2021) ("While every oil spill instance is different, and circumstances vary, the C-NLOPB said a best guess for recovery in ideal conditions is up to an average of just 10 per cent.").

[125]Southern California Spill Response, *Update 11: The Unified Command is Continuing its Response Sunday to the Coastal Oil Spill in Orange and San Diego Counties*, https://socalspillresponse.com/update-11-the-unified-command-is-continuing-its-response-sunday-to-the-coastal-oil-spill-in-orange-and-san-diego-counties/ (Oct. 10, 2021)

monitoring of the shoreline for tar balls and other oil incidents, including oil sheens which have appeared as recently as November.[126] In short, the consequences of the oil spill continue to be felt in the community.

134.    While all closures have been lifted, the long-term impacts from the spill are unknown and the stigma associated with the oil spill remains.

## VI    PLAINTIFFS' FACTS

### A.    Commercial Fishing Class Representative Plaintiffs

135.    Plaintiffs Donald C. Brockman ("Brockman") and Heidi M. Jacques ("Jacques") are residents and citizens of Orange County, California. Mr. Brockman is the trustee of the Donald C. Brockman Trust and Ms. Jacques is the trustee of the Heidi M. Brockman Trust. The Donald C. Brockman Trust and Heidi M. Brockman Trust jointly own three commercial fishing boats: the Little Viking, a 31 ½ foot boat presently docked in Los Angeles with a crew of two; the Donz Rig, a 42-foot boat presently docked in Newport Harbor with a crew of two; and the Freelance, a 71-foot boat presently docked in Newport Harbor with a crew of five. Plaintiffs Brockman and Jacques regularly fish for squid in open access fisheries, including those fishing blocks closed by the oil spill, on the above-named boats. The closure of the Newport Harbor caused by the oil spill prevented Plaintiffs' boats from leaving the harbor and consequently prevented them from running their commercial fishing business. Defendants' acts and omissions have therefore caused present injury to Plaintiffs. Plaintiffs Brockman and Jacques are members of and seek to represent the Commercial Fishing Class.

136.    Plaintiff John Crowe ("Crowe") is a resident and citizen of King Harbor, Redondo Beach, California. Crowe is a commercial fisher who primarily fishes for lobster and squid in Blocks 718, 719 and 720, which were closed due to the oil spill. Crowe has suffered significant damages, including lost profit due to the

---

[126] The OCR, https://www.ocregister.com/2021/12/28/authorities-announce-cleanup-of-octobers-oil-spill-off-orange-county-complete/?clearUserState=true

inability to bait and set traps or otherwise operate during the harbor and fisheries closures. In addition, Crowe's fishing gear and boat engine were damaged or lost as a result of the oil spill and related response activities (*e.g.*, skimmers). Defendants' acts and omissions have therefore caused present injury to Crowe. Plaintiff Crowe is a member of and seeks to represent the Commercial Fishing Class.

137.   Plaintiff Josh Hernandez ("Hernandez") is a resident and citizen of Capistrano Beach, California. He is a commercial fisher, who previously served as deckhand for almost a decade. Hernandez owns his boat based out of Dana Point, California, where he fishes primarily, but not exclusively, for lobster, crab, and snail in Blocks 737, 756, and 757, all of which were closed because of Defendants' oil spill. As a result, Hernandez suffered significant damages. The harbor and fisheries closures resulting from the spill precluded Hernandez from baiting and setting his 300 lobster traps and crab pots. Hernandez also suffered damages related to harm to his primary hatcheries/fisheries, lost bait, boat repairs, and recovering traps from closed blocks and harbor closure at Dana Point. Defendants' acts and omissions have therefore caused present injury to Hernandez. Plaintiff Hernandez is a member of and seeks to represent the Commercial Fishing Class.

138.   Plaintiff LBC Seafood, Inc. ("LBC Seafood"), is a California corporation located at 1436 Cherry Avenue, Long Beach, California. LBC Seafood is a family-owned, international seafood wholesaler that purchases lobster from fishers in Orange County and sells them to buyers as far north as Redondo Beach and as far south as San Diego. Additionally, LBC Seafood sells lobster to larger wholesalers and distributers who distribute the product throughout California and as far away as Asia. The oil spill affected the fishing blocks from which LBC Seafood sources its product. With the commercial lobster season opening October 6, 2021, and running until March, 2022, LBC Seafood has suffered significant damages because the closure of the fisheries prevented the harvesting of lobster for two of the six-month season. LBC Seafood expects that the spill will cause continued

impairment of its ability to earn a living and remain operational in the commercial lobster and fishing industries. Defendants' acts and omissions have therefore caused present injury to LBC Seafood. Plaintiff LBC Seafood is a member of and seeks to represent the Commercial Fishing Class.

139. Plaintiff Quality Sea Food Inc. ("Quality Sea Food"), a California corporation located at 100 S. International Boardwalk, Redondo Beach, California, is a historic seafood market operating since 1953, engaged in the sale and distribution of commercial retail seafood. Jeffrey Jones ("Jones") is the Chief Executive Officer and President of Quality Sea Food. Since the oil spill, Quality Sea Food has experienced a decline in business because of customers' hesitancy to purchase seafood. Because Quality Sea Food sourced its products from fishing lots shuttered by the oil spill, including the commercial lobster season that normally runs from October 6, 2021 until March, 2022, Quality Sea Food experienced significant economic losses. In addition, Quality Sea Food has incurred serious losses with other types of seafood, including, but not limited to: red snapper, California halibut, rock cod, Mexican snapper, striped bass, tilapia, sea bass, mahi, sardines, anchovies, smelt, pomfret, black cod, mackerel, sheephead, octopus, and squid. Quality Sea Food relies on the Southern California fisheries from as far south as Newport Beach and the many surrounding fisheries supporting the species necessary to keep their international seafood market open to the public. Quality Sea Food operates as a first point of landing for many fishers impacted by the oil spill, as well as a weighmaster for those same commercial fishers. Quality Sea Food experienced negative consequences arising from the oil spill caused by Defendants, which impaired its ability to operate a commercial seafood market business. Defendants' acts and omissions have therefore caused present injury to Quality Sea Food. Plaintiff Quality Sea Food is a member of and seeks to represent the Commercial Fishing Class.

**B.      Real Property Class Representative Plaintiffs**

140.   Plaintiffs John and Marysue Pedicini (the "Pedicinis") are husband and wife residents and citizens of Newport Beach, California. The Pedicinis own waterfront property in Orange County via the T & G Trust, with John and Marysue Pedicini acting as trustees of the trust. The spill prevented the Pedicinis from enjoying and using their property, such as walking the beach and swimming. The oil spill further harmed the pristine views the Pedicinis' property normally provides. Defendants' acts and omissions have therefore caused present injury to the Pedicinis. The Pedicinis are members of and seek to represent the Real Property Class.

141.   Plaintiffs Rajasekaran Wickramasekaran and Chandralekha Wickramasekaran (the "Wickramasekarans") are residents and citizens of California. They are the Co-Trustees of The Wickramasekaran Family Trust and owners of a waterfront, duplex property located in Newport Beach, California. The Wickramasekarans rent their property consistently throughout the year via villarentalsinc.com, with a policy requiring a 3-night minimum rental. The rental unit at address 6602 A West Oceanfront is rented out for approximately $356 daily, and 6602 B (the upstairs unit) is rented out for approximately $483 daily. The oil spill harmed the Wickramasekarans' property and rental income. Defendants' acts and omissions have therefore caused present injury to the Wickramasekarans. The Wickramasekarans are members of and seek to represent the Real Property Class.

**C.      Waterfront Tourism Class Representative Plaintiffs**

142.   Plaintiff Banzai Surf Company, LLC ("Banzai Surf"), a California limited liability company located at 6340 East El Paseo Court, Long Beach, California, is a year-round surf school that has been operating on Huntington State Beach for decades. Banzai Surf delivers premier surf instruction to Huntington Beach residents and youth as well as tourists. Banzai Surf was unable to offer surf lessons because of the oil spill caused by Defendants' conduct and the consequent

beach closures. Further, the decline in tourism due to the oil spill led to a significant decline in demand for surf lessons even after the beach closures were lifted, causing Banzai Surf to lose additional revenue. Defendants' acts and omissions have therefore caused present injury to Banzai Surf. Plaintiff Banzai Surf is a member of and seeks to represent the Waterfront Tourism Class.

143.   Plaintiff Beyond Business Incorporated, d/b/a Big Fish Bait & Tackle ("BFBT"), is a California corporation located 1780 Pacific Coast Highway, Seal Beach, California. BFBT is a landmark in the Seal Beach community, having opened in the 1960s. BFBT exists to serve the fishing communities in and about the Orange County coast. The store provides fishing supplies, such as rods, reels, tackle, lures, and other related items. BFBT further provides live and frozen bate. For recreational fishermen, both on and offshore, this live bait is the means to successful fishing in the coastal waters. As certain bait can only be kept for so long, BFBT relied, and continues to rely, on regular customers and foot-traffic in order to avoid the economic loss associated with discarding unpurchased, expired items. Because of the Defendants' oil spill, BFBT experienced a dramatic reduction in customers and foot traffic. Beginning October 2, 2021, BFBT customer base has dropped 50% or more and BFBT incurred significant financial losses because of the oil spill. When the fishing ban was implemented, BFBT was in the untenable position of selling bait to non-existent customers. This economic hardship forced BFBT to lay off its employees. BFBT incurred un-recouped business expenses, as well as loss of revenue, income, and profits because of Defendants' oil spill. Defendants' actions, inactions, and/or omissions have caused present injury to BFBT. Plaintiff BFBT is a member of and seeks to represent the Waterfront Tourism Class.

144.   Plaintiffs Bongos Sportfishing LLC and Bongos III Sportfishing LLC (collectively "Bongos") is a California limited liability company located at 400 Main St, Newport Beach, California. Bongos has operated 6-pack fishing charters

out of Newport Beach for over 25 years. Because of the oil spill, Bongos' boats were unable to come into the harbor of Newport Beach from October 2, 2021 to October 9, 2021. Bongos also lost substantial business in cancelled bookings and incurred damages to its boats from discharged oil, thus resulting in significant financial losses. Defendants' acts and omissions have caused present injury to Bongos. Plaintiff Bongos is a member of and seeks to represent the Waterfront Tourism Class.

145.   Plaintiff Davey's Locker Sportfishing, Inc. ("Davey's Locker") is a California corporation doing business at 400 Main Street, Newport Beach, in Orange County, California. Since 1958, Davey's Locker has offered deep-sea fishing and whale and dolphin watching excursions, as well as charter fishing boats and private boat rentals, to its customers out of Newport Harbor. The oil spill closed Newport Harbor and closed fisheries between Sunset Beach to San Clemente out eight nautical miles from the coast, preventing Davey's Locker's boats from leaving the harbor and thus preventing it from running its business of offering excursions and rentals. Even after the harbor reopened, Davey's Locker experienced declined demand for its services until the end of 2021. Defendants' acts and omissions have therefore caused present injury to Davey's Locker. Pursuant to the Oil Pollution Act, Davey's Locker presented its claim to the Amplify Defendants in mid-October 2021 and more than 90 days have since expired. Plaintiff Davey's Locker is a member of and seeks to represent the Waterfront Tourism Class.

146.   Plaintiff East Meets West Excursions ("East Meets West") is a California limited liability company located at 509 S. Bay Front, Newport Beach, California. East Meets West provides whale and dolphin watching off the Southern California coast. The oil spill caused by Defendants resulted in substantial harm to East Meets West's business, including cancelled bookings and special maintenance to its boats due to contamination with oil. East Meets West was unable to operate

during the closure of Newport Beach harbor. In addition, once the harbor was reopened, East Meets West experienced reduced demand for its services and cancelled bookings. Defendants' acts and omissions have therefore caused present injury to East Meets West. Pursuant to the Oil Pollution Act, East Meets West presented its claim to the Amplify Defendants in early November 2021 and more than 90 days have since expired. Plaintiff East Meets West is a member of and seeks to represent the Waterfront Tourism Class.

147.   Plaintiff Tyler Wayman ("Wayman") is a resident and citizen of Costa Mesa, California. He is a fulltime, licensed commercial boat captain, and private contractor. Wayman makes his living from running boats up and down the Orange County coast and from the coast to Catalina. The oil spill and harbor closing impacted the regularity and consistency of his bookings, leading to lost revenue and significant financial losses. Defendants' actions, inactions, and/or omissions have caused present injury to Wayman. Plaintiff Wayman is a member of and seeks to represent the Waterfront Tourism Class.

## VII   CLASS ACTION ALLEGATIONS

148.   Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of classes of similarly situated persons. Plaintiffs initially propose three classes, as defined below:

### Commercial Fishing Class

Persons or entities who owned or worked on a commercial fishing vessel docked in Newport Harbor or Dana Point Harbor as of October 2, 2021, and/or who landed seafood within the California Department of Fish & Wildlife fishing blocks 718-720, 737-741, 756-761, 801-806, and 821-827 between October 2, 2016 and October 2, 2021, and were in operation as of October 2, 2021, as well as those persons and businesses who purchased and resold commercial seafood so landed, at the retail or

wholesale level, that were in operation as of October 2, 2021.

### Real Property Class

Owners or lessees, between October 2, 2021, and December 31, 2021, of residential waterfront and/or waterfront properties or residential properties with a private easement to the coast located between the San Gabriel River and the San Juan Creek in Dana Point, California.

### Waterfront Tourism Class

Persons or entities in operation between October 2, 2021, and December 31, 2021, who:

(a) owned or worked on a sea vessel engaged in the business of ocean water tourism (including sport fishing, sea life observation, and leisure cruising) and accessed the water between the San Gabriel River and San Juan Creek in Dana Point; or

(b) owned businesses that offered surfing, paddle boarding, recreational fishing, and/or other beach or ocean equipment rentals and/or lessons or activities; sold food or beverages; sold fishing bait or equipment, swimwear or surfing apparel, and/or other retail goods; or provided visitor accommodations south of the San Gabriel River, north of the San Juan Creek, and west of:

(1) Highway 1 in Seal Beach;

(2) Orange Avenue and Pacific View Avenue in Huntington Beach; and

(3) Highway 1 south of Huntington Beach.

149.   Excluded from the proposed Classes are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the judge to whom this case is assigned, the judge's staff, and any member of the judge's immediate family, (3) businesses that contract directly with the Amplify Defendants

for use of the Pipeline, and (4) all employees of the law firms representing Plaintiffs and the Class Members.

150.   Each Class seeks monetary damages and injunctive relief. The injunctive relief that Plaintiffs and the Classes seek includes an order requiring the Amplify Defendants to pay a third-party engineering firm approved by the Court to design and develop the following, which the Amplify Defendants must then implement:

a.   a plan to either trench and bury the entirety of the Pipeline and then cover the Pipeline with a rock shield, or build a berm over the existing Pipeline;

b.   a plan to monitor displacement of the line, which could include installing a fiber-optic cable sensor, GPS monitoring, bi-annual video monitoring, or other forms of bi-annual underwater inspection;

c.   an automatic shutoff valve system and SimSuite or equivalent smart spill detection technology along the entire Pipeline,

d.   the reconfiguration of set-points for all critical and safety alarms, and a procedure for clearing these alarms, that is in effect both during the Pipeline's normal operation and during maintenance, all of which is to be incorporated into the Amplify Defendants' Integrity Management Plan and Operations and Maintenance; and

e.   a control room monitoring and training plan that has to be incorporated into the Amplify Defendants' Integrity Management Plan and Operations and Maintenance, which includes doubling control room staffing, increasing the training for all staff, hiring control room operations managers who are required to sign off on any pipeline restart, and requiring control room operations managers to manually investigate the cause of any critical or safety alarm and issue a report indicating the cause of said alarm before restart.

151.   Plaintiffs reserve the right to propose additional or more refined classes or subclasses of Plaintiffs in connection with their Motion for Class Certification, and as determined by the Court in its discretion.

152.   The Classes satisfy the requirements of Rule 23(a) and Rule 23(b) and there are no interclass conflicts.

153.   **Ascertainability**: The number and identity of class members can be easily ascertained. Those with the type of businesses or properties described in the class definitions above, and located in the geographic areas described, can easily identify themselves. The proposed classes are defined with respect to objective criteria.

154.   **Numerosity**: The members of the Classes are so numerous that joinder of all members is impractical. The proposed Classes likely contain hundreds if not thousands of members.

155.   **Commonality**: There are common questions of law and fact that predominate over any questions affecting only individual members of the Classes including, but not limited to, the following:

a.      Whether Defendants acted negligently, recklessly, wantonly, and/or unlawfully to cause the spill;

b.      Whether the Amplify Defendants installed and maintained adequate safety measures and systems on the Pipeline that ran from the Elly offshore oil platform to the Port of Long Beach and in its systems of command and control to prevent and/or mitigate the spill;

c.      Whether the Amplify Defendants conducted adequate supervision of the Pipeline that could have prevented the spill or reduced its scale;

d.      Whether the Amplify Defendants knowingly, intentionally, or negligently concealed, suppressed, or omitted material facts concerning the safety of the Pipeline from the public;

e.      Whether the Amplify Defendants knowingly, intentionally, or negligently concealed, suppressed, omitted, or delayed relaying material facts regarding the spill to local, state, and federal agencies, thereby slowing the response, and/or increasing the damages to Plaintiffs and members of the Classes;

f.      Whether the Shipping Defendants negligently struck the Pipeline by failing to adequately monitor and/or adjust their anchorage;

g.      Whether Defendants are strictly liable to Plaintiffs and the Classes, by virtue of state and/or federal laws.

156.   **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all the members of the Classes have been injured by the same wrongful acts and omissions of Defendants. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes, and are based on the same legal theories.

157.   **Adequacy of Representation**: Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Classes, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Classes.

158.   **Rule 23(b)(2):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2). The Amplify Defendants have acted on grounds that apply generally to the proposed Classes, and a single remedy ensuring that the Pipeline, if it becomes operational, is subject to appropriately stringent safety measures to ensure a spill like this does not happen again is a single remedy that is appropriate for the proposed Classes, because no Plaintiff or putative class member wants another oil spill.

159.   **Rule 23(b)(3)**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Classes, and a class action is superior to individual litigation. The amount of damages available to most individual plaintiffs is insufficient to make litigation addressing Defendants' conduct economically viable in the absence of the class action procedure. Individualized litigation also presents the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer case management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

160.   **Rule 23(c)(4)**: Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). The claims of members of the Classes include specific questions of law and fact that are common to all members of the Classes and capable of class wide resolution that will significantly advance the litigation.

# VIII   CAUSES OF ACTION

## First Claim for Relief

**Strict Liability under Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code Section 8670, *et seq*.**

*(On behalf of all Classes against the Amplify Defendants)*

161.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

162.   The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act (the "Act" or "OSPRA") provides that "[a]ny responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured party which arise out of, or are caused by, the discharge or leaking of oil into or onto marine waters." Cal. Gov. Code § 8670.56.5(a).

163.   The Pacific Ocean and the waters off the Southern California Coast are "marine waters" as defined in Section 8670.03(i).

164.   The Amplify Defendants are "responsible part[ies]," which includes "the owner or transporter of oil or a person or entity accepting responsibility for the oil."

165.   The oil transported through the Pipeline is "oil" within the meaning of the Act, which defines "oil" as "any kind of petroleum, liquid hydrocarbon, or petroleum products or any fraction or residues therefrom," including "crude oil."

166.   As the responsible party for the oil transported through the Amplify Defendants' Pipeline, the Amplify Defendants are absolutely liable under the OSPRA for any damage incurred by any injured party arising out of the spill.

167.   On or about October 1, 2021, the Amplify Defendants discharged or leaked crude oil into the Pacific Ocean and are therefore absolutely liable without regard to fault for all damages that Plaintiffs and the Classes sustained or will sustain. That discharge was not permitted by state or federal law.

168.   The Act entitles a plaintiff to recover a wide variety of damages, including, but not limited to, loss of subsistence use of natural resources; injury to, or economic losses resulting from destruction of or injury to, real or personal property, which shall be recoverable by any claimant who has an ownership or leasehold interest in property; loss of taxes, royalties, rents, or net profit shares caused by the injury, destruction, loss, or impairment of use of real property, personal property, or natural resources; and loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. *See generally* Cal. Gov. Code § 8670.56.5(h).

169.   The contamination illegally caused by the discharge of crude oil into or upon area beaches and the Pacific Ocean injured, caused to be lost, and/or impaired the use of property or natural resources on which Plaintiffs and the Classes depend for their livelihood, including, but not limited to, local beaches,

harbors, and marine waters; populations of fish, lobster, squid and shellfish; and marine ecosystems. It also caused injury to and destruction of real or personal property, as well as impairment of earning capacity of Plaintiffs and the Classes.

170.   Because Plaintiffs and the Classes have been damaged, the Amplify Defendants are absolutely liable for their damages. Additionally, because Plaintiffs and the members of the Classes have ownership or leasehold interests in real property that have been injured by the Amplify Defendants, the Amplify Defendants are absolutely liable for these damages. Moreover, because Plaintiffs and members of the putative Classes rely on natural resources for subsistence use that have been injured, destroyed, or lost by the Amplify Defendants, the Amplify Defendants are absolutely liable for these damages. Finally, because the Amplify Defendants have injured or destroyed real property, personal property, or natural resources and Plaintiffs members of the Classes derive at least 25% of their annual or seasonal earnings from activities that utilize the injured property or natural resources, the Amplify Defendants are absolutely liable for these damages.

171.   The injury, destruction, loss, and/or impairment of usability of these natural resources and property has caused Plaintiffs and the Classes to lose profits and will cause future losses of profits and/or impair their earning capacities. The long-lasting effects of contamination related to the discharge of toxic crude oil into the Pacific Ocean, coastal areas, beaches, and harbors—resources which Plaintiffs and the Classes rely on—requires that Plaintiffs and the Classes continue future monitoring and testing activities in order to ensure that such marine life is not contaminated and is safe and fit for human consumption, that the toxic oil from the spill does not further contaminate and degrade Plaintiffs' property, and that their earning capacity is not impaired.

172.   The Amplify Defendants are liable to Plaintiffs and the Classes under Government Code § 8670.56.5 (f) and (h) for all damages resulting from the discharge of oil from the Pipeline, including but not limited to loss of profits or

impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources; and for attorney's fees, costs of suit, and expert witnesses.

## **Second Claim for Relief**

**Violation of the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq*.**

*(On behalf of all Classes against the Amplify Defendants)*

173.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

174.   The Federal Oil Pollution Act ("OPA") provides that "each responsible party for…a facility from which oil is discharged…into or upon the navigable waters or adjoining shorelines…is liable for the removal costs and damages…that result from such incident." 33 U.S.C. § 2702(a).

175.   Recoverable damages include "injury to, or economic losses resulting from destruction of, real or personal property," "the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources." *Id.* at (b)(2)(B) & (E).

176.   OPA defines "facility" as including a "pipeline" used for transporting oil. 33 U.S.C. § 2701(7).

177.   In the case of a discharge of oil from a pipeline, the "responsible party" is "any person owning or operating the pipeline." 33 U.S.C. § 2701(32)(E).

178.   The Amplify Defendants are the owners and operators of the at-issue Pipeline, and are thus the "responsible party."

179.   The Amplify Defendants' Pipeline is a "facility" as it is a pipeline that transports oil.

180.   The Amplify Defendants "discharged" oil pursuant to 33 U.S.C. § 2701(7).

181.   The Pacific Ocean and Orange County coastal waters are "navigable waters" under OPA, 33 U.S.C. § 2701(21).

182.   The Amplify Defendants' actions, inactions and/or omissions directly caused many thousands of gallons of toxic crude oil to be spilled into and upon the navigable waters off of the Orange County coastline. The contamination illegally caused by the discharge of crude oil into the ocean and upon area beaches injured, and/or impaired the use of property and/or natural resources on which Plaintiffs and the Classes depend for their livelihood, including, but not limited to, local beaches, harbors, and marine waters; populations of fish, lobster, squid and shellfish; and marine ecosystems. It also caused injury to and destruction of real or personal property, as well as impairment of earning capacity of Plaintiffs and the Classes.

183.   Plaintiffs and members of the Classes have suffered and will continue to suffer injury, economic losses, loss of profits, and impairment of their earning capacity as a result of the discharge of oil from the Amplify Defendants' Pipeline. The harm to Plaintiffs and members of the Classes includes but is not limited to the elimination of fishing and related activities in and about eleven fishing blocks, property damage, canceled ocean-charter events and reduced foot traffic to onshore businesses and reduced demand for fishing products.

184.   Under OPA, the Amplify Defendants are responsible for compensating Plaintiffs and the Classes for their current and future injuries, removing the oil from the environment, and restoring the natural resources harmed and/or destroyed as a result of the Amplify Defendants' oil spill.

### **Third Claim for Relief**

### **Strict Liability for Ultrahazardous Activities**

*(On behalf of all Classes against the Amplify Defendants)*

185.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

186.   At all times herein, the Amplify Defendants were the owners and operators of the Pipeline.

187.   At all times relevant to this action, the Amplify Defendants had supervision, custody, and control of the Pipeline.

188.   The Amplify Defendants were engaged in ultrahazardous activities by transporting flammable, hazardous, and toxic oil through a severely corroded Pipeline in a high consequence area and near a major population center.

189.   The transportation of oil in this manner and in this setting created a high degree of risk of harm to persons, lands, and chattels of others. These include risks to fish and mammals in the ocean, persons, and entities operating in coastal waters, boats and equipment in coastal waters, coastal real property, and businesses and persons living or working near and/or on the coast.

190.   It is very likely that the harm resulting from a spill in a high consequence area near a major population center would be great, because of how ocean currents quickly carry oil, making total containment impossible. The risk in such a setting cannot be eliminated by the exercise of reasonable care.

191.   Deep offshore drilling in Southern California is not common. Indeed, there are only four offshore platforms in federal waters south of Los Angeles that are serviced by two pipelines. Three offshore platforms – the Eureka, Elly, and Ellen – transport oil through the Pipeline. The other platform, the Edith, transports oil via an underwater pipeline to the Eva platform near the coast.[127]

192.   Transporting ultrahazardous oil in a sensitive marine environment adjacent to a major population center is completely inappropriate and inherently dangerous. Any value to the community of transporting oil is far outweighed by the inherent danger of such an activity to the water, the coastline, the fish, real and personal property, local businesses, and tourism.

193.   It was not merely the sensitive geographic area that elevated the hazardousness of the Amplify Defendants' activities, but also the Amplify

---

[127] *See* California State Lands Commission, Mineral Resources Management: *Safety and Oil Prevention Audit: DCOR, LLC Platform Eva* (Dece. 2016), https://www.slc.ca.gov/wp-content/uploads/2018/10/Eva.pdf

Defendants' pre-spill failures—their faulty leak-detection system, understaffed and/or fatigued crew, inadequate and/or nonexistent manual safeguards, and decades-old components and infrastructure that failed. As a result, the Amplify Defendants' ultrahazardous activities did exactly what should have been expected—caused substantial harm to the environment and surrounding communities.

194.    The harm to Plaintiffs and the Classes was and is the kind of harm that would be reasonably anticipated as a result of the risks created by Defendants transporting flammable, hazardous, and toxic oil in a corroded and ill-maintained pipeline in the Pacific Ocean and near a large population center with a robust ocean tourism economy. Offshore oil spills in such areas kill fish and wildlife, both offshore and onshore. Oil spills moreover injure and close public and private beaches and harbors, public and private property, including coastal real property, fishing boats, charter boats, and other ocean equipment. Moreover, it is reasonable to anticipate that an offshore oil spill near a major population center that relies on beach and ocean tourism activities would cause economic injuries to businesses that cater to beach and ocean tourism, including those providing charters and surfing lessons, and coastal restaurants and apparel and other tourism shops in the vicinity of the ocean.

195.    These are precisely the harms that occurred here. Defendants' operation of the Pipeline and its failure was a substantial factor in causing the harms suffered by Plaintiffs and the Classes.

196.    Plaintiffs and members of the Classes are entitled to recover actual damages.

197.    The acts and omissions of Defendants were conducted with malice, fraud, and/or oppression as set out in this Complaint.

**Fourth Claim for Relief**

**Negligence**

*(On behalf of all Classes against All Defendants)*

198.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

199.   Defendants owed a duty to Plaintiffs and the Classes to exercise reasonable and ordinary care. That duty arose generally as well as from, among other things, federal, state, and local laws, ordinances, and regulations that require the Amplify Defendants to operate a pipeline in a manner that does not endanger or damage public health and safety. These laws include, but are not limited to, the Lempert-Keene Act, Cal. Gov. Code § 8670, *et seq.*, the Oil Pollution Act, 33 U.S.C. § 2701, *et seq.*, the Porter-Cologne Act, Water Code § 13000, *et seq.*, Cal. Fish & Game Code § 5650, *et seq.*, the Federal Clean Water Act, 33 U.S.C. § 1251 *et seq.*, Cal. Health & Safety Code § 25510(a), applicable county codes, and state and federal spill response and notification laws.

200.   Additionally, the Shipping Defendants owed a duty to Plaintiffs and the Classes to exercise ordinary and prudent maritime, nautical, and navigational skills to avoid striking the Pipeline.

201.   Amplify Defendants also owed Plaintiffs and the Classes a duty of care because Defendants diminished the quantities of available sea life, and Defendants could reasonably have foreseen that negligently conducting their drilling, extraction, and shipping operations, including negligently responding to the spill, may diminish aquatic life and injure these individuals and businesses that depend on the health of the marine environment near the Pipeline, including fishers, fish processors, and water tourism businesses.

202.   Defendants also owed Plaintiffs and the Classes a duty of care because Defendants had special relationships with the Plaintiffs and the Classes. Having operated their businesses near the Orange County coastline, it was foreseeable that

Defendants' failure to safely operate the Pipeline and vessels, and mitigate the impacts of the spill, would harm these Classes. Plaintiffs suffered injury as a result of Defendants' failures, because Defendants' actions have fouled the ocean, beaches, harbors, and coastal properties. Additionally, Defendants' failures were closely connected to the harms Plaintiffs have suffered and will continue to suffer, Defendants' gross misconduct causing an oil spill is morally blameworthy, and policy reasons favor imposing a duty on Defendants in order to deter future misconduct by Defendants and other pipeline and vessel operators.

203.  Defendants breached their duty to Plaintiffs and the Classes. Among other things, the Amplify Defendants failed to install reasonable safety equipment to prevent a spill, failed to detect and repair corrosion, failed to have adequate safety measures in place to detect the spill expeditiously, failed to adequately train their crew at the Beta Unit Complex's control centers how to identify problems with and properly respond to leak-detection notifications, failed to implement a protocol that prevented crew fatigue, and failed to promptly respond to and contain the spill. Worse, the Amplify Defendants failed to notify the appropriate government agencies at a time when measures could have been taken to significantly mitigate the crisis.

204.  The Shipping Defendants failed to exercise ordinary and prudent maritime, nautical, and navigational skills to avoid striking the Pipeline. The Shipping Defendants' vessels, while at anchor, drifted erratically during the early morning hours of January 25, 2021—breaking their anchorage swing circles. Between them the vessels crossed the Pipeline at least 9 times with their anchors dragging across the seabed. The Shipping Defendants further breached their duty of care by violating numerous federal regulations setting forth the rules for pilots at sea. For example, the Shipping Defendants failed to maintain a proper look-out, by sight and available radar, and failed to use navigational technologies to avoid crossing (and eventually striking) the Pipeline. *See* 33 C.F.R. § 83.05. The Shipping

Defendants failed to use all available means appropriate under the circumstances to determine the high-risk of collision with the Pipeline and to assess actions to avoid collision under the circumstances. *See* 33 C.F.R. § 83.07. The Shipping Defendants further breached their duty of care by anchoring too closely to the Pipeline—and each other—in a dense vessel traffic separation scheme. *See* 33 C.F.R. §§ 83.09, 83.10. The Shipping Defendants also failed to notify the authorities after striking the Pipeline. *See* 33 C.F.R. § 160.216.

205. The Amplify Defendants, in the exercise of reasonable care, should have known that the Pipeline could rupture or otherwise fail, that vessel congestion in the San Pedro Bay required additional monitoring of the Pipeline, that their safety measures were insufficient to detect and contain a spill, that their crew at the Beta Unit Complex were undertrained and fatigued, and that the Pipeline could spill significant amounts of oil. The Shipping Defendants knew or should have known of the Pipeline's location. Indeed, the Pipeline is marked on nautical navigation charts. Large container ships, such as the *MSC Danit* and *Beijing*, are and/or should have been equipped with radar and navigational technologies to detect and avoid underwater, stationary structures, such as the 17.5-mile Pipeline at issue. *See* 33 C.F.R. § 83.07.

206. In addition, Defendants' violations of the above-cited statutes, ordinances, and/or regulations resulted in precisely the harm to Plaintiffs and the Classes that the laws listed above were designed to prevent, and Plaintiffs and the Classes are members of the class of persons for whose protection those laws were adopted.

207. At all times herein mentioned, Amplify Defendants negligently, wantonly, carelessly and/or recklessly maintained and operated the Pipeline and vessels, respectively.

208. As a direct and proximate result of Defendants' negligence, Plaintiffs and the Classes have been injured and have suffered damages. Those damages may

be short-term and long-term. As a direct and legal cause of the Defendants' wrongful acts, inactions, and omissions herein above set forth, Plaintiffs and the Classes have suffered and will continue to suffer harm, injury to earning capacity, loss of use of their real property, wrongful occupation of their real property, and other losses.

209.   The short-term damages include loss of profits due to fishing, re-selling fish, harbor, and beach closures caused by the spill, and increased costs associated with traveling to different fisheries and maintaining boats and equipment that cannot be used. The necessary closures caused by the spill excluded fishers and charter workers and entities from near-shore fishing grounds. The short-term damages also include lost profits due to cancellations from customers who, but for Defendants' oil spill, would have used services offered by businesses in Orange County, or simply visited Orange County and the businesses there. The short-term damages additionally include loss of use and enjoyment of beachfront and oceanfront real property because of oil polluting and closing the beaches and waters, as well as potential lost rental income and profits from vacationers and tourists visiting Orange County.

210.   The long-term damages include future lost profits due to the harm caused to the fisheries themselves. For example, the oil contamination is likely to depress populations of crab, lobster, squid and other crustaceans by directly killing numbers of those species or hindering their breeding and feeding. Similarly, oil that sinks below the surface will poison fish and potentially smother their eggs, limiting their future numbers. The oil spill has and may continue to drive down the price of local fish and shellfish, as consumers and fish processors become wary of producing locally caught species. Defendants' oil spill caused physical injury to property in which Plaintiffs and the Classes have a direct ownership interest or an interest by virtue of their right to harvest fish and shellfish.

211.   The oil spill's long-term damages may also diminish the values of oceanfront and beachfront real properties along the coast that have been polluted by Defendants' oil.

212.   Similarly, the image of the Southern California Coast as a pristine place and as a perfect place to vacation has been tarnished. Images of oil-soaked wildlife and fouled beaches will dissuade people from visiting the region and the many businesses that depend on tourism and other visitors.

213.   The acts, inactions, and omissions of Defendants, and each of them, were conducted with malice, fraud, and/or oppression as described in this Complaint.

## **Fifth Claim for Relief**

### **Public Nuisance**

*(On behalf of all Classes against All Defendants)*

214.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

215.   Defendants owed a non-transferable, non-delegable duty to the public, including Plaintiffs and Class members, to conduct their business, in particular the maintenance and/or operation of the Pipeline and their navigable ships, in a manner that did not threaten harm or injury to the public welfare.

216.   By causing the discharge of tens of thousands of gallons of ultra-toxic crude oil into the Pacific Ocean and onto the Orange County coastline, Defendants, by acting and/or failing to act, as alleged hereinabove, have created a condition that was harmful to the health of the public, indecent and offensive to the senses, an obstruction to the free use of property, an obstruction to the free passage or use of the ocean and public beaches, and a fire hazard. In short, Defendants' acts or failures to act impacted public health, public safety, and the comfort and convenience of the public.

217.   The oil spill affected a substantial number of individuals similarly situated to the Plaintiffs, such as citizens of and visitors to Orange County, who were prevented from using and enjoying the Southern California beaches and water as a result of the spill, including attending the Pacific Airshow on Sunday, October 3, 2021.

218.   The oil spill caused by Defendants' misconduct is a condition that would reasonably annoy and disturb an ordinary person, as shown by, for example, the health impacts warned of by the county, the community outrage in response to the spill, and the nationwide interest in the spill's impacts on the Southern California Coast.

219.   The seriousness and gravity of that harm outweighs the social utility of Defendants' conduct. There is little or no social utility associated with causing the release of tens of thousands of gallons of oil into the unique ecological setting of Orange County. Further, there is little or no social utility associated with failing to take reasonable steps that account for obvious changes in the risks tethered to a particular activity—such as vessel congestion in the San Pedro Bay.

220.   Plaintiffs and the Classes suffered harm and injury that is different in kind from members of the general public. While members of the general public could not enjoy the public beach and ocean, had to endure the stench of oil, were obstructed from freely using the public beaches and oceans, and were prevented from recreationally fishing, the Plaintiffs and the Classes' suffered injury to their coastal private property rights and rights incidental to those property rights, their fish catch, and their economic livelihoods. They did not consent to these injuries, which are different from the type of harm suffered by the general public.

221.   The acts and omissions of Defendants described herein were also in violation of various California state laws including but not limited to the Lempert-Keene Act, Cal. Gov. Code § 8670, *et seq.*, the Oil Pollution Act, 33 U.S.C. § 2701,

- 79 -

*et seq.*, the Porter-Cologne Act, Water Code § 13000, *et seq.*, and Cal. Fish & Game Code § 5650, *et seq*.

222.   Defendants' violations of those statutes directly and proximately caused, and will cause, injury to the Plaintiffs and the Classes of a type which the statutes are intended to prevent. Plaintiffs and the Classes are of the class of persons for whose protection these statutes were enacted.

223.   As a direct and legal cause of Defendants' wrongful acts and/or omissions herein above set forth, Plaintiffs and the Classes have suffered and will suffer economic harm, injury, and losses.

224.   Additionally, to remedy the harm caused by Defendants' nuisance, Plaintiffs will seek public injunctive relief against Defendants, including the injunctive relief requested above.

225.   In maintaining the nuisance, which is ongoing, Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Defendants were done with malice, fraud, and/or oppression as described in this Complaint.

## **Sixth Claim for Relief**

### **Negligent Interference With Prospective Economic Advantage**

*(On behalf of All Classes Against All Defendants)*

226.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

227.   Plaintiffs and the Classes have existing or prospective economic relationships with citizens of Orange County, visitors to Orange County, and other individuals and organizations doing business in and related to Orange County.

228.   These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs and the Classes.

229.   Defendants knew or should have known of these existing and prospective economic relationships.

230.   Defendants owed a duty to Plaintiffs and the Classes to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiffs and the Classes.

231.   The Amplify Defendants breached that duty to Plaintiffs and the Classes by, among other things, failing to install and/or maintain reasonable safety equipment to prevent such an oil spill, failing properly to maintain the Pipeline in a safe condition, failing to have adequate safety measures in place to detect the spill expeditiously, failing to adequately train their crew at the Beta Unit Complex's control centers how to identify problems with and respond to leak-detection notifications, failing to implement and ensure protocol that eliminated fatigued crew, and the Shipping Defendants breached that duty by failing to responsibly operate their vessels with appropriate care.

232.   Defendants knew or should have known that, if they failed to act with reasonable care, the existing and prospective economic relationships of Plaintiffs and the Classes would be interfered with and disrupted.

233.   Defendants were negligent and failed to act with reasonable care as set forth above.

234.   Defendants engaged in wrongful acts and/or omissions as set forth above, including but not limited to their violations of federal, state, and local laws that require Defendants to operate their Pipeline and vessels in a manner that does not damage public health and safety.

235.   As a direct and proximate result of Defendants' wrongful acts and/or omissions, Defendants negligently and recklessly interfered with and disrupted the existing and prospective economic relationships of Plaintiffs and the Classes. As a direct and proximate result of Defendants' wrongful acts and/or omissions, Plaintiffs and the Classes have suffered and will suffer economic harm, injury, and losses as set forth above.

## **Seventh Claim for Relief**

### **Trespass**

*(On behalf of Real Property Class against all Defendants)*

236.   Plaintiffs, who have a real property interest in waterfront property, bring this on behalf of themselves and all other similarly situated landowners or lessees. They incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

237.   Defendants caused the discharge of a polluting matter beyond the boundary of Plaintiffs' and Class Members' real property in such a manner that it was reasonably foreseeable that the pollutant would, in due course, invade Plaintiffs' and Class Members' real property and cause harm.

238.   By causing the discharge of polluting matter, Defendants entered, invaded, and intruded on the real properties of Plaintiffs and the Class Members without privilege, permission, invitation, or justification.

239.   Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiffs' and Class Members' real properties. Defendants also owed a duty to Plaintiffs and Class Members to exercise reasonable care in the manufacture, maintenance, and operation of the Pipeline and vessels, respectively.

240.   Defendants had a heightened duty of care to Plaintiffs and the Class because of the great dangers associated with transporting oil and navigating container ships, respectively, so near to pristine coastal residential areas and nearby real properties along the Southern California Coast.

241.   The Amplify Defendants breached the duty they owed to Plaintiffs and members of the Class when they failed to exercise reasonable care in the manufacture, maintenance, and operation of the Pipeline, which conduct resulted in entry, intrusion, or invasion on Plaintiffs' and Class Members' real properties.

242.   The Shipping Defendants breached the duty they owed to Plaintiffs when they failed to exercise reasonable care in operating their vessels without

striking the Pipeline, which conduct resulted in entry, intrusion, or invasion on Plaintiffs' and Class Members' real properties.

243.   Defendants knew or should have known that their conduct would foreseeably result in a disastrous oil spill, causing damage to the real properties and economic interests of persons in the area affected by the spill.

244.   As a direct and proximate result of Defendants' trespass, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income and other economic loss.

245.   Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class Members to punitive damages.

## Eighth Claim for Relief

### Continuing Private Nuisance

*(On behalf of Real Property Class against All Defendants)*

246.   Plaintiffs, who have a real property interest in waterfront property, bring this claim on behalf of themselves and all other similarly situated landowners or lessees. They incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

247.   Defendants' actions and inactions caused, maintained, and/or permitted the contamination alleged in this action by their negligence, intentional or otherwise, actionable acts, and/or omissions.

248.   Defendants created the contamination at issue, which is harmful to both human health and the environment and interferes with Plaintiffs' and Class Members' comfortable use and enjoyment of the real property in which they have a possessory interest.

249.   The Amplify Defendants were, at all relevant times, in sufficient control of their Pipeline and, and the Shipping Defendants in sufficient control of their vessels, to have known of the threatened release of oil and associated

hydrocarbons and to have prevented the resulting contamination. Defendants knew or should have known that their negligent operation of the Pipeline and vessels would have, and did, cause the contamination described herein.

250. Despite knowledge and forewarning, Defendants failed to take reasonable steps to prevent the failure that resulted in the contamination at issue.

251. Defendants failed to take reasonable steps to abate the contamination at issue. The contamination is, however, abatable, and, therefore, it is continuing in nature. This also confirms that Defendants have knowingly maintained the nuisance, *i.e.,* the contamination at issue.

252. Plaintiffs and the Class did not consent to the ongoing damage to the use and enjoyment of their properties as a result of Defendants' actions and inactions.

253. As a result, Plaintiffs have and will continue to suffer damages, both economic and otherwise.

254. The contamination described herein constitutes a nuisance within the meaning of Section 3479 of California Civil Code.

## Ninth Claim for Relief

**Violation of California's Unfair Competition Law, Cal. Bus. and Prof. Code § 17200, *et seq.***

*(On behalf of all Classes against all Defendants)*

255. Plaintiffs and Class Members incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

256. Defendants have engaged in and continue to engage in unfair competition in violation of California's Unfair Competition Law ("UCL").

257. Defendants' conduct constitutes unlawful and unfair business practices within the meaning of the UCL.

258. Defendants' conduct amounts to unlawful conduct because their conduct constitutes common law negligence, trespass, and nuisance, and they

violated Civ. Code § 3479 (prohibiting obstruction to the free use of property, so as
to interfere with the comfortable enjoyment of life or property), Cal. Health &
Safety Code § 25510(a) (requiring handlers of hazardous material to immediately
report the release or threatened release thereof to the unified program agency),
OSPRA, Cal. Gov. Code § 8670.56.5, *et seq.* (imposing liability for any damages or
injury resulting from an oil spill), OPA 33 U.S.C. § 2701, *et seq.* (same), and the
Porter-Cologne Act, Water Code § 13000, *et seq.* (the principal law governing
water quality).

259.   Defendants' conduct amounts to "unfair" business practices because
the policies underlying the statutes and the common law are implicated by
Defendants' misconduct. Defendants' practices offend established public policies,
are dishonest, unfair, and do not comport with standards of care embodied in
various statutes and common laws, including negligence. The impact of
Defendants' practices on Plaintiffs and the Class Members, and the environment,
has been sustained and substantial, and is in no way mitigated by any justifications,
reason, or motives. Defendants' conduct relating to the spill has no utility when
compared to the harm done to Plaintiffs and members of the Class.

260.   As a direct and proximate result of Defendants' unfair and unlawful
methods of competition, acts or practices, Plaintiffs and Class Members have
sustained injuries and are entitled to injunctive relief pursuant to California
Business and Profession Code sections 17203 and 17204.

261.   Indeed, the UCL permits Plaintiffs to obtain an injunction "as may be
necessary to prevent the use or employment by any person of any practice which
constitutes unfair competition." Cal. Bus. & Prof. Code § 17203. Accordingly,
Plaintiffs are entitled to injunctive relief to prevent future spills against the Amplify
Defendants, as described herein.

## IX   REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, request

judgment against Defendants as follows:

A.   for all recoverable compensatory, statutory, and other damages, including remediation costs, sustained by Plaintiffs and the Classes, and all relief allowed under applicable laws;

B.   for costs;

C.   for both pre-judgment and post-judgment interest on any amounts awarded;

D.   for treble damages insofar as they are allowed by applicable laws;

E.   for appropriate individual relief as requested above;

F.   for injunctive relief as requested above;

G.   for payment of attorneys' fees and expert fees as may be allowable under applicable law, including Cal. Gov. Code § 8670.56.5(f) the Private Attorneys General Act ("PAGA"), Cal. Lab. Code. § 2698, *et seq.*;

J.   for exemplary or punitive damages under Cal. Civ. Code § 3294 for the oppression, fraud, and malice alleged above; and

K.   for such other and further relief, including declaratory relief, as the Court may deem just and proper.

## X     DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 21, 2022                    Respectfully Submitted,

*/s/ Wylie A. Aitken*
Wylie A. Aitken

*/s/ Lexi J. Hazam*
Lexi J. Hazam

*/s/ Stephen G. Larson*
Stephen G. Larson

Wylie A. Aitken, State Bar No. 37770
Darren O. Aitken, State Bar No. 145251
Michael A. Penn, State Bar No. 233817
Megan G. Demshki, State Bar No. 306881

FIRST AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT
CASE NO.: 8:21-CV-1628-DOC(JDEX)

**AITKEN✦AITKEN✦COHN**
3 MacArthur Place, Suite 800
Santa Ana, CA 92808
Telephone: (714) 434-1424
Facsimile: (714) 434-3600

Lexi J. Hazam, State Bar No. 224457
Elizabeth J. Cabraser, State Bar No. 083151
Robert J. Nelson, State Bar No. 132797
Wilson M. Dunlavey, State Bar No. 307719
**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Kelly K. McNabb, *admitted pro hac vice*
**LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Stephen G. Larson, State Bar No. 145225
slarson@larsonllp.com
Steven E. Bledsoe, State Bar No. 157811
sbledsoe@larsonllp.com
Rick Richmond, State Bar No. 194962
rrichmond@larsonllp.com
Paul A. Rigali, State Bar No. 262948
prigali@larsonllp.com
**LARSON, LLP**
600 Anton Blvd., Suite 1270
Costa Mesa, CA 92626
Telephone: (949) 516-7250
Facsimile: (949) 516-7251

*Interim Co-Lead Counsel for Plaintiffs and
the Proposed Classes*

Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
David C. Wright, State Bar No. 177468
dcw@mccunewright.com
James G. Perry (SBN 281356)
jgp@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
18565 Jamboree Road, Suite 550
Irvine, CA 92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

1                                                    Elaine S. Kusel, NJ Bar No. 319302020

Elaine S. Kusel, NJ Bar No. 319302020
(*pro hac vice* pending)
esk@mccunewright.com
Sherief Morsy, NJ Bar No. 125042015
(*pro hac vice* pending)
sm@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
One Gateway Center, Suite 1500
Newark, NJ 07102
Telephone: (973) 888-1203
Facsimile:  (909) 557-1275

*Attorneys for Plaintiff Beyond Business
Incorporated*

Robert B. Hutchinson, State Bar No. 45367
rhutchinson@cpmlegal.com
Gary A. Praglin, State Bar No. 101256
gpraglin@cpmlegal.com
Kelly W. Weil, State Bar No. 291398
kweil@cpmlegal.com
Nanci E. Nishimura, State Bar No. 152621
nnishimura@cpmlegal.com
Hannah Brown, State Bar No. 337592
hbrown@cpmlegal.com
**COTCHETT, PITRE & McCARTHY,
LLP**
2716 Ocean Park Blvd., Suite 3088
Santa Monica, CA  90405
Telephone:  (310) 392-2008
Facsimile:   (310) 310-0111

*Attorneys for Plaintiff Banzai Surf
Company, LLC*

Alexander Robertson,IV,
State Bar No. 127042
**ROBERTSON & ASSOCIATES, LLP**
32121 Lindero Canyon Rd. Suite 200
Westlake Village, CA 91361
Telephone: (818) 851-3850
Facsimile: (818) 851-3851

*Attorneys for Plaintiffs Donald Brockman
and Heidi M. Jacques, and Davey's Locker
Sportfishing, Inc.*

1                           Matthew C. Maclear, SBN 209228
                             Jason R. Flanders, SBN 238007
2                           Erica A. Maharg, SBN 279396
                             J. Thomas Brett, SBN 315820
3                           **AQUA TERRA AERIS LAW GROUP**
                             4030 Martin Luther King Jr. Way Oakland,
4                           CA 94609
                             Phone: 415.568.5200
5                           Email: mcm@atalawgroup.com

6                           *Attorneys for Plaintiffs LBC Seafood, Inc.,*
                           *Quality Sea Food, Inc., and Josh Hernandez*
7

8                           Alex R. Straus (SBN 321366)
                           *astraus@milberg.com*
9                           **MILBERG COLEMAN BRYSON**
                           **PHILLIPS GROSSMAN, PLLC**
10                          280 S. Beverley Drive
                           Beverly Hills, CA 90212
11                         Tel.: (917) 471-1894
                           Fax: (310) 496-3176
12

13                           *Attorneys for Plaintiffs Rajasekaran*
                           *Wickramasekaran and Chandralekha*
14                         *Wickramasekaran*

15                     **SIGNATURE CERTIFICATION**

16             Pursuant to L.R. 5-4.3.4(a)(2)(i), I hereby attest that all signatories listed, and
17
on whose behalf the filing is submitted, concur in this filing's content and have
18
authorized this filing.
19

20                           */s/ Stephen G. Larson*
                           Stephen G. Larson

21

22

23

24

25

26

27

28